UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA

```
-------------------------------------------------------------x
JOHN DOE,                                           |        Index No.  2:21-cv-04198-DCN
                                                    |
            Plaintiff,                              |
                                                    |
THE CITADEL, THE MILITARY COLLEGE                   |
OF SOUTH CAROLINA, GLENN M.                         |
WALTERS, in his official capacity at The            |
Citadel, VALERIE MERCADO, in her official           |
capacity at The Citadel, and JANET SHEALY,          |
individually and in her official capacity at        |
The Citadel,                                        |
                                                    |
            Defendants.                             |
-------------------------------------------------------------x
```

## COMPLAINT & JURY DEMAND

PLAINTIFF JOHN DOE (a pseudonym[1]), through his attorneys, by and for his

Complaint, respectfully alleges as follows:

## THE NATURE OF THIS ACTION

1.      This constitutional due process and Title IX action is brought on behalf of Plaintiff

John Doe ("John Doe"), who was a scholarship cadet at The Citadel, The Military College of South

Carolina ("The Citadel") until he was dismissed with leave to apply for possible readmission after

one year because he was found, erroneously, to have committed an act of sexual violence in non-

consensual physical contact of a sexual nature by rubbing his front side against the backside of a

female cadet Jane Roe and touching her buttocks at the Law Barracks Sally Port in violation of

Class I, Code 410 of The Citadel.  As a result, John Doe lost his Marine scholarship which he

_____

[1] Plaintiff John Doe has filed herewith a motion to proceed by pseudonym and giving pseudonym
status also to the college complainant "Jane Roe.".

needed to attend The Citadel, presently cutting him off from his hope and dream of becoming a military officer, and John Doe has further been denied employment positions and has had to explain to other schools to which he was seeking admission what happened at The Citadel with respect to the disciplinary case. John Doe, however, did not commit the act of which he was accused.

2.    On October 18, 2019, Jane Roe filed her complaint with The Citadel, complaining about John Doe flirting with her the prior school year and accusing John Doe of three incidents, including one involving his groping her two weeks earlier (which was early October 2019) while she was visiting with her female cadet friend at the Law Barracks Sally Port.

3.    The case against John Doe at the Commandant's Board was based on Jane Roe's say-so about three different alleged incidents and the female cadet friend of Jane Roe partly corroborating one alleged incident at the Law Barracks Sally Port. John Doe denied the accusations, pointing out that with respect to the alleged incident at the Law Barracks Sally Port, he was at a Marine Lab and was staying away from Jane Doe, and had he seen Jane Doe, at the time it would have been coming from a Marine Lab and his hands would not have been free to grope Jane Roe as he was carrying his Kevlar and his rifle. Witnesses for John Doe said that John Doe was not near Jane Roe at the Law Barracks Sally Port and that they never saw John Doe engage in any sexual harassing or sexually violent behavior toward Jane Roe.  Character witnesses for John Doe said he would not have engaged in the alleged behavior. John Doe obtained video surveillance footage of the Law Barracks Sally Port where John Doe allegedly rubbed against Jane Roe, but Jane Roe conveniently changed the supposed date of the incident from a date in early October 2019 to on or about September 12, 2019 and video footage of the Law Barracks Sally Port was not available before early October 2019 and what was available was deemed not relevant even

though it disproved Jane Roe's initial dating of the alleged incident at the Law Barracks Sally Port. Jane Roe was allowed extensively to cross-examine a number of the witnesses, but when Jane Roe was asked by John Doe's representative about "false memory," the Board President cut off the questioning.

4.      The Commandant's decision was to find it was more likely than not that John Doe committed an act of sexual violence in non-consensual physical contact of a sexual nature by rubbing his front side against the backside of Jane Roe at the Law Barracks Sally Port. The decision was based on judging Jane Roe and her female friend more credible than John Doe and the witnesses who corroborated John Doe's account. That credibility determination was made, however, contrary to: (i) the change in Jane Roe's date of the alleged incident at the Law Barracks Sally Port from early October 2019 to September 12, 2019, that conveniently made unavailable video footage of the Law Barracks Sally Port; (ii) the difference between Jane Roe's complaint description of the incident (groping) to what the Commandant's Board supposedly found (rubbing up against); (iii) the non-acceptance of two of the three accusations made by Jane Roe; (iv) John Doe's consistent denial of all the accusations; (v) the witnesses for John Doe who denied that John Doe had engaged in the accused incidents and that they never saw John Doe engage in any sexual harassing or sexually violent behavior toward Jane Roe; and (vi) John Doe's character witnesses. Trumping an objective assessment of the evidence was a "believe the woman" gender bias.

5.      John Doe's appeal was denied even though John Doe provided new evidence in two additional cadets who were on guard duty on September 12, 2019, and whose eyewitness testimony refuted Jane Roe's story about John Doe engaging in any sexual violence against her. Defendants were committed to a gender biased result. It took gender bias and a process lacking in key elements of due process to produce the result in this case.

## **THE PARTIES**

6.     John Doe is a natural person presently residing in New Jersey.

7.     The Citadel is a state-incorporated college with the address of 171 Moultrie Street, Charleston, South Carolina 29409. Established in 1842, The Citadel has an undergraduate body of students that make up the Corps of Cadets and has graduate students in a Graduate College. The Citadel is one of six senior military colleges in the United States. The Citadel has seventeen academic departments divided into five schools. In the undergraduate military program, the student cadets pursue bachelor's degrees and live on campus.

8.     General Glenn M. Walters is the President of The Citadel and a resident of South Carolina and is being sued in his official capacity.

9.     Valerie Mercado is the current Title IX Coordinator at The Citadel and a resident of South Carolina and is being sued in her official capacity.

10.     Janet Shealy is the Director of Cadet Advocacy, Response and Education ("CARE") and is a resident of South Carolina. CARE is the sexual assault center at The Citadel and is intended to promote a culture and climate of help prevent sexual harassment, assault and rape. Janet Shealey is being sued in her official capacity.

## **JURISDICTION AND VENUE**

11.     This Court has federal and supplemental jurisdiction pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1343 and 28 U.S.C. § 1367 because: (i) the case arises under the laws of the United States; and (ii) the claims brought under Title IX of the Educational Amendments of 1972, 20 U.S.C. § 1681 et seq., and 42 U.S.C. § 1983 are civil rights claims.

[4]

12.     This Court has personal jurisdiction over Defendants on the ground that The Citadel and individual Defendants affiliated with The Citadel are conducting business within the State of South Carolina.

13.     Venue for this action properly lies in this district pursuant to 28 U.S.C. §1391 because the events or omissions giving rise to the claim occurred in this judicial district.

## FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

A.     **Federal Statutes and Regulations Forbid Gender Discrimination And Retaliation and Require Prompt and Equitable Disciplinary Proceedings.**

14.     Title IX of the Education Amendments Act of 1972 provides in relevant part that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C.§ 1681(a).

15.     Title IX applies to all public and private educational institutions that receive federal funds, including colleges and universities.

16.     The Citadel is a recipient of federal funds, including grants for research, and is therefore bound by Title IX and its regulations.

17.     As interpreted by federal courts, Title IX protects students attending federally-funded educational institutions from discrimination based on gender. A federally-funded educational institution violates Title IX if it subjects a male student to adverse treatment because of his gender.

18.     Complementing Title IX, the Jeanne Clery Disclosure of Campus Security Policy and Campus Crime Statistics Act is a federal statute requiring federally-funded educational

institutions to maintain and disclose campus crime statistics and security information. 20 U.S.C. § 1092(f).

19.     Under the Clery Act, as amended in 2013, school disciplinary procedures for alleged sexual misconduct must "provide a prompt, fair, and impartial investigation and resolution." 20 U.S.C. § 1092(f)(8)(B)(iv)(i)(aa).

20.     The U.S. Department of Education's regulations implementing Title IX require federally-funded educational institutions to "adopt and publish grievance procedures providing for prompt and equitable resolution of student…complaints alleging any action which would be prohibited" by Title IX and implementing federal regulations. 34 C.F.R. § 106.8(b).

21.     Regulations implementing the Clery Act require that campus Title IX proceedings:

   a.     "[i]nclude a prompt, fair, and impartial process from the initial investigation to the final result"

   b.     be conducted by trained officials

   c.     "be completed within reasonably prompt timeframes designated by an institution's policy, including a process that allows for the extension of timeframes for good cause with written notice to the accuser and the accused of the delay and the reason for the delay"

   d.     be conducted in a way that is "consistent with the institution's policies and transparent to the accuser and accused"

   e.     include "timely notice of meetings at which the accuser or accused, or both, may be present"

   f.     give "timely and equal access to the accuser, the accused, and appropriate officials to any information that will be used during informal and formal disciplinary meetings and hearings"

   g.     be "[c]onducted by officials who do not have a conflict of interest or bias for or against the accuser or the accused"

   h.     include in "any initial, interim, and final decision by any official or entity authorized to resolve disciplinary matters" "the rationale for the result and the sanctions."

34 C.F.R. § 668.46(k).

**B.     OCR's 2001 Guidance Affirms the Requirement that**
**Disciplinary Proceedings Be Prompt and Impartial.**

22.     The Department of Education's Office for Civil Rights ("OCR") is the federal agency in charge of enforcing Title IX compliance.

23.     In 2001, after a public notice-and-comment period, OCR issued a document entitled "Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties" ("2001 Guidance").

24.     OCR's 2001 Guidance "identified a number of elements in evaluating whether a school's grievance procedures are prompt and equitable." These elements apply to private and public colleges and universities and include "[a]dequate, reliable, and impartial investigation of complaints, including the opportunity to present witnesses and other evidence," and "[d]esignated and reasonably prompt timeframes for the major stages of the complaint process." The 2001 Guidance further stated that "[a]ccording due process to both parties involved, will lead to sound and supportable decisions" and that the "due process" requirement applies to both public and private colleges and universities.

**C.     Starting in 2011, the Federal Government Pressured Educational**
**Institutions to Provide More Protection to Students Alleging Sexual**
**Assault On The Basis Of Protecting Women.**

25.     Starting in 2011, the federal government, including OCR, began to take aggressive steps to combat what it viewed as an epidemic of sexual assault on college campuses.

26.     On April 4, 2011, the Office for Civil Rights ("OCR") of the U.S. Department of Education ("DOE") sent a "Dear Colleague Letter" to colleges and universities (hereinafter referred to as the "April 2011 Dear Colleague Letter"). The "April 2011 Dear Colleague Letter," while now revoked, was in effect when Columbia's disciplinary procedures were put in place and

the alleged sexual assault occurred in this case. Before the 2011 Dear Colleague Letter, colleges and universities generally did not use its disciplinary procedures to adjudicate sexual misconduct cases and certainly not in the manner and frequency that they have since the issuance of the April 2011 Dear Colleague Letter. The April 2011 Dear Colleague Letter thus provides a necessary set of background facts to this action: http://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.html.

27.     Although the April 2011 Dear Colleague Letter marked a substantial change in OCR's position on how schools should handle disciplinary proceedings under Title IX, OCR did not conduct the public notice and comment process required for proposed regulations. See 5 U.S.C. § 553. The 2011 Dear Colleague Letter (p. 1) defined discrimination on the basis of sex to include sexual harassment of students, which was defined to include acts of sexual violence. The April 2011 Dear Colleague Letter provided that, in order to comply with Title IX, colleges and universities must have prompt procedures to investigate and resolve complaints of sexual misconduct.

28.     The press release announcing the April 2011 Dear Colleague Letter stated that it was "the first specifically advising schools, colleges and universities that their responsibilities under Title IX include protecting students from sexual violence" and that it included "new steps to help our nation's schools, universities and colleges end the cycle of sexual violence on campus." The press release made clear the focus was on protecting women: it stated that despite past progress "the threat of violence and abuse continues for a new generation of women"; it lauded the "unprecedented coordination and cooperation across the federal government to combat violence against women"; it stated that one in five women "will be a victim of sexual assault during college" (a statistic that would later be thoroughly discredited that, if had it been true, would represent triple

[8]

the rate of rape for the same demographic in war-torn Somalia)[2]; and it highlighted "the Administration's commitment to raising awareness and promoting policies to prevent sexual violence against women of all ages."

29.     The April 2011 Dear Colleague Letter itself explicitly focused on protection of women and effectively equated "victims" and "complainants" in sexual misconduct proceedings as women who must receive preferential treatment.  For instance, the April 2011 Dear Colleague Letter: (i) stated -- incorrectly -- that "1 in 5 women are victims of completed or attempted sexual assault while in college" (p. 2); (ii) warned that "the majority of campus sexual assaults occur when women are incapacitated, primarily by alcohol" (p. 2); (iii) suggested educational institutions seek grants from the U.S. Department of Justice's Office on Violence against Women, which require institutions to "develop victim service programs and campus policies that ensure victim safety, [and] offender accountability . . ." (p. 19); and (iv) warned educational institutions that they must "never" view the "victim at fault for sexual violence" if she has been using "alcohol or drugs" and asks "schools to consider" providing students who violate alcohol or drug policies with amnesty if they allege they were sexually assaulted while consuming alcohol or drugs (p. 15).

30.     The 1 in 5 "statistic" cited by the April 2011 Dear Colleague Letter came from a disputed 2007 study, which was based on an overly broad definition of sexual assault and which, according to the study authors, was not derived from a nationally representative sample. Schow, "No, 1 in 5 Women Have Not Been Raped on College Campuses," Washington Examiner, August 13, 2014, http://www.washingtonexaminer.com/no-1-5-women-have-not-been-raped-on-college-campuses/articles/2551980.

---

[2] Somalia Human Development Report, UN Development Programme, 2012, Table A4-28.

31.    Bureau of Justice Statistics (DOJ) study, 1995-2013, published in December 2014 found that college-age female students on campus were less likely to be victims of sexual assault than non-students and the real number of college women assault victims is .03 in 5; these statistics do not support the notion of a "crisis" of violence against women. Rape and Sexual Assault Victimization among College Age Females, 1995-2013 (Special Report), U.S. Department of Justice, December 2014, http://www.bjs.gov.content/pub/pdf/ravcaf9513.pdf.

32.    The April 2011 Dear Colleague Letter, in order to provide females what was unjustified preferential treatment, imposed numerous mandates that inherently made it more difficult for males accused of sexual misconduct to defend themselves. The "April 2011 Dear Colleague Letter" (pp. 10-11) required schools to adopt a relatively low burden of proof -- the preponderance of the evidence ("more likely than not") -- in cases involving sexual misconduct, including sexual assault. Several colleges had been using "clear and convincing," and some, like Stanford University, applied the criminal standard, "beyond a reasonable doubt." The April 2011 Dear Colleague Letter (p. 12) also strongly discouraged allowing cross-examination of complainants because it "may be traumatic or intimidating" to the alleged victim. The "April 2011 Dear Colleague Letter" stated (p. 12) that schools should give both parties the right to appeal a decision, which amounts to double jeopardy for an accused student. After the April 2011 Dear Colleague Letter was published, schools changed their sexual assault and sexual harassment policies and procedures. Additionally, the "April 2011 Dear Colleague Letter" stated (pp. 15-16) that schools should "minimize the burden on the complainant," transferring alleged perpetrators, if necessary, away from shared courses or housing.

33.    On April 29, 2014, the OCR published a document signed by then Assistant Secretary of Education in charge of the OCR Catherine E. Lhamon ("Secretary Lhamon") and

bearing the title "Questions and Answers   on   Title   IX   and Sexual Violence." (the "2014 Q&A"): http://www2.ed/gov./about/offices/list/ocr/docs/qa-201404-title-ix.pdf. The 2014 Q&A continued OCR's effort to restrict students' ability to defend themselves by reducing or eliminating the ability to expose credibility flaws in the allegations made against them. For example, OCR's 2014 Q&A states that schools: (i) "must not require a complainant to be present" at sexual misconduct disciplinary hearings" (p. 30); (ii) may decide to eliminate all opportunities for "cross-examination" (p. 31); and (iii) must avoid "revictimization" by minimizing the number of times a victim is interviewed so "complainants are not unnecessarily required to give multiple statements about a traumatic event" (pp. 30, 38).

34.     Neither OCR's April 2014 Q&A nor the April 2011 Dear Colleague Letter were subject to notice-and-comment rule-making, yet both the OCR's April 2014 Q&A and the April 2011 Dear Colleague Letter constituted substantive decision-making.

35.     In a letter dated December 30, 2014, the OCR informed the Harvard Law School that the sexual misconduct policy it continued to use after issuance of the April 2011 Dear Colleague Letter "improperly used a 'clear and convincing' evidence standard of proof in its Title IX grievance procedures, in violation of Title IX." (Emphasis in original.) The OCR letter stated that the higher clear and convincing standard of proof was inconsistent with preponderance of the evidence standard required by Title IX for investigating allegations of sexual harassment or violence and directed the Harvard Law School, by January 15, 2015, to adopt procedures "that comply with the applicable Title IX regulations and OCR policy," which procedures must include "[a]n explicit statement that the preponderance of evidence standard will be used for investigating allegations of sexual harassment or violence." https://www2.ed.gov/documents/press-releases/harvard-law-letter.pdf.   Other schools, including State University of New  York-Buffalo

and Princeton University, were required by the OCR to use the preponderance of the evidence standard in adjudicating sexual misconduct cases.

36.     Prior to 2011 Dear Colleague guidance, schools were not required to adjudicate sexual harassment claims, which Dept. of Education had identified as "the exclusive province of the police and...the [local] district attorney."[3] OCR invited --indeed demanded -- that schools take on this authority and use it in accordance with their official (but not statutory) guidance, under pain of Federal investigation that would incur reputational harm, legal fees, not to mention possible loss of Federal grants.[4] Thus, this guidance effectively mandated schools public and private to exercise this function.

37.     The April 2011 Dear Colleague Letter and April 2014 Q&A led colleges and universities to devise victim centered procedures for adjudicating sexual assault that are not neutral and impartial; and the reality is that males are almost always the "accused" respondents and females are almost always the "victim" complainants. Almost all complainants are females and almost all respondents are males. A study by United Educators showed 99% of the accused are male. "Confronting Campus Sexual Assault: An Examination of Higher Education Claims," https://web.archive.org/web/201701225139/https://www.ue.org.UploadedFiles/Confronting%20 Campus%20Sexual%20Assault.pdf.

38.     While the April 2011 Dear Colleague Letter reaffirmed in principle that both accusers and accused have the right to have a prompt and equitable resolution, including the right to an adequate, reliable, and impartial investigation, similar and timely access to any information that will be used at the hearing and adequately trained fact-finders and decision makers, the April

---

[3] *Brentwood Acad. v. TN Secondary School Athletic Association*, 531 U.S. 288, 302–03 (2001).
[4] Privatization and State Action: Do Campus Sexual Assault Hearings Violate Due Process?, TX. L. Rev. 96:15 (2017), Jed Rubenfeld, pg. 20-21, 48.

2011 Dear Colleague Letter also, however, contained other provisions which expanded the nature and scope of schools' responsibility to address sexual misconduct, essentially compelling them to choose between fundamental fairness for students and continued federal funding. These provisions are not required by Title IX and are not consistent with legal precedent and due process.

39.    Among other things, the April 2011 Dear Colleague Letter defined sexual harassment broadly as "unwelcome conduct of a sexual nature," conflating cases based on conduct with cases based on speech; stated that "mediation is not appropriate even on a voluntary basis" in cases involving alleged sexual assault; directed schools to ensure "steps taken to accord due process rights to the alleged perpetrator do not restrict or unnecessarily delay the Title IX protections for the complainant"; directed schools to take interim steps to protect complainants and "minimize the burden on the complainant"; "strongly discourage[d]" schools from allowing cross-examination of parties; and urged schools to focus on victim advocacy.

40.    Even though the April 2011 Dear Colleague Letter purported to be a "guidance" document and did not go through rule-making procedures, OCR framed many of its directives as mandatory. Moreover, the letter contained an explicit threat to colleges and universities: "When a recipient does not come into compliance voluntarily, OCR may initiate proceedings to withdraw Federal funding by the Department or refer the case to the U.S. Department of Justice for litigation."

41.    The overriding purpose of the April 2011 Dear Colleague Letter was "to make it easier for victims of sexual assault to make and prove their claims and for the schools to adopt punitive measures in response," and OCR "demand[ed] that universities do so or face a loss of federal funding." *Doe v. Brandeis Univ.*, 177 F. Supp. 3d 561, 572 (D. Mass. 2016). As the

Brandeis court observed, while "[t]he goal of reducing sexual assault, and providing appropriate discipline for offenders, is certainly laudable," the effect of the letter was "the elimination of basic procedural protections—and the substantially increased risk that innocent students will be punished."

42.     The April 2011 Dear Colleague Letter has been described as the "first warning shot" that OCR intended to punish any school that failed to handle sexual assault proceedings as OCR wanted.

43.     After the 2011 Dear Colleague Letter, the federal government continued to pressure colleges to deal aggressively with reported sexual assaults, to adopt procedures that do not safeguard the rights of the accused, and to start with the presumption that a complainant is telling the truth.

44.     In 2014, OCR released additional guidance in which it reiterated many of the directives set forth in the April 2011 Dear Colleague Letter, including the directive to "ensure that steps to accord any due process rights do not restrict or unnecessarily delay the protections provided by Title IX to the complainant." In addition, OCR advised schools to give employees and students "trauma-informed" training and said, "hearings should be conducted in a manner that does not inflict additional trauma on the complainant."

45.     The same year, a White House Task Force was created, co-chaired by the Office of the Vice President and the White House Council on Women and Girls. The Task Force continued the government's focus on protection of women, with a mission "to tell sexual assault survivors that they are not alone" and "help schools live up to their obligation to protect students from sexual violence."

46.     The Task Force's first report opened with the claim that "[o]ne in five women is sexually assaulted in college," stated that the federal government was ramping up Title IX enforcement efforts, and stressed again that schools found in violation of Title IX risked losing federal funding.

47.     The Task Force also pressed colleges and universities to provide "trauma-informed" training for their officials, stating that "when survivors are treated with care and wisdom, they start trusting the system, and the strength of their accounts can better hold offenders accountable."

48.     The report stated that the Justice Department, through its Center for Campus Public Safety and its Office on Violence Against Women, was developing trauma-informed training programs.

49.     Ultimately, the Justice Department funded a "Start by Believing" campaign under which investigators are trained to investigate cases from an initial presumption of guilt and write reports "that successfully support the prosecution of sexual assault cases." End Violence Against Women International, Effective Report Writing: Using the Language of Non-consensual Sex, at 5, https://www.evawintl.org/library/DocumentLibraryHandler.ashx?id=43; see also Campus Action Kit, Start by Believing, https://www.startbybelieving.org/wp-content/uploads/2018/08/Campus-Action-Kit.pdf.

50.     Among other things, "Start by Believing" training direct investigators to "recreate the entire reality of the sexual assault from the perspective of the victim." "Start by Believing" training tells investigators: "By writing the report to recreate the reality of the sexual assault and refute potential defense strategies, investigators can greatly increase the likelihood that charges will be filed in the case and it will result in a conviction. They may even help to make this process faster, smoother, and easier for the victim than it would otherwise be. As one experienced

prosecutor summarized, 'a well-written report can make a jury trial into a bench trial and a bench trial into a guilty plea.'"

51.     The Obama Administration, through the DOE and OCR, treated the April 2011 Dear Colleague Letter as binding on regulated parties for all practical purposes and thus has pressured colleges and universities to aggressively pursue investigations of sexual assaults on campuses. Then Secretary Lhamon, Assistant Secretary of the Department of Education ("DOE") in charge its Office for Civil Rights ("OCR"), delivered what was treated as marching orders by colleges and universities.

52.     In February 2014, then Assistant Secretary Lhamon told college officials attending a conference at the University of Virginia that schools need to make "radical" change. According to the Chronicle of Higher Education, college presidents said afterward that there were "crisp marching orders from Washington." Assistant Secretary Lhamon told college officials attending a conference that existing practices for handling sexual misconduct complaints send a message "that victimized students are worth less than the people who assault them;" that school officials and she as "chief enforcer" needed to "radically change that message;" and that "if you don't want to do it together, I will do it to you." "Colleges Are Reminded of Federal Eye on Handling of Sexual-Assault Cases," Chronicle of Higher Education, February 11, 2014.

53.     In June 2014, then Assistant Secretary Lhamon testified at a Senate Hearing in that "some schools are still failing their students by responding inadequately to sexual assaults on campus. For those schools, my office and this Administration have made it clear that the time for delay is over." Assistant Secretary Lhamon stated at the Senate Hearing in June 2014 that "we do" expect institutions to comply with the April 2011 Dear Colleague Letter. Assistant Secretary Lhamon told the Senate Committee, "This Administration is committed to using all its tools to

ensure that all schools comply with Title IX . . ." She further told the Committee: If OCR cannot secure voluntary compliance from the recipient, OCR may initiate an administrative action to terminate and/or refuse to grant federal funds or refer the case to the DOJ to file a lawsuit against the school. Assistant Secretary Lhamon additionally stood behind the "April 2011 Dear Colleague Letter."

54.     In July 2014, then Assistant Secretary Lhamon, speaking at a conference on campus sexual assault held at Dartmouth College, stated that she was prepared to cut off federal funding to schools that violate Title IX and that she would strip federal funding from any college found to be non-compliant with the requirements of the April 2011 Dear Colleague Letter. "Do not think it's an empty threat," then Assistant Secretary Lhamon warned. She went on to describe that enforcement mechanism as part of a set of "very, very effective tools," adding "If a school refuses to comply with Title IX in any respect, I will enforce." Assistant Secretary Lhamon was quoted: "It's not surprising to me that we haven't gone to the last step.     It means that so far the process has been working." Meredith Clark, "Official to colleges: Fix sexual assault or lose funding," July 15, 2014, available at: http://www.msnbc.com/msnbc/campus-sexual-assaultconference-dartmouth-college#51832.

55.     Then Assistant Secretary Lhamon was quoted in the Los Angeles Times stating, "We don't treat rape and sexual assault as seriously as we should, . . . [There is] a need to push the country forward." Savage and Timothy M. Phelps, "How a little-known education office has forced far-reaching changes to campus sex assault investigations," Los Angeles Times, August 17, 2015.

56.     To support effectively making the "April 2011 Dear Colleague Letter" binding, the OCR hired hundreds of additional investigators for Title IX enforcement. The sharp increase

in the number of investigations was accompanied by increases in the scope of OCR's investigations, in findings that schools had violated Title IX, and in the imposition of punitive measures as a result. The Federal Government investigated over 250 schools for possible Title IX violations, including notable schools. According to the Chronicle of Higher Education, that number eventually grew to over 500. The overwhelming majority of OCR's investigations and findings have involved alleged violations of the rights of complaining students. Indeed, in 2016, OCR for the first time found Title IX violations in response to a complaint by a disciplined student.

57.     The Obama Administration, through the DOE and OCR, treated the April 2011 Dear Colleague Letter as binding on regulated parties for all practical purposes and thus has pressured colleges and universities to aggressively pursue investigations of sexual assaults on campuses. Then Secretary Lhamon, Assistant Secretary of the Department of Education ("DOE") in charge its Office for Civil Rights ("OCR"), delivered what was treated and understood as marching orders by colleges and universities.

58.     In February 2014, Assistant Secretary Lhamon told college officials attending a conference at the University of Virginia that schools need to make "radical" change. According to the Chronicle of Higher Education, college presidents said afterward that there were "crisp marching orders from Washington." "Colleges Are Reminded of Federal Eye on Handling of Sexual-Assault Cases," Chronicle of Higher Education, February 11, 2014.

59.     In June 2014, then Assistant Secretary Lhamon testified at a Senate Hearing in that "some schools are still failing their students by responding inadequately to sexual assaults on campus. For those schools, my office and this Administration have made it clear that the time for delay is over." Assistant Secretary Lhamon stated at the Senate Hearing in June 2014 that "we

do" expect institutions to comply with the 2011 Dear Colleague Letter. Assistant Secretary Lhamon told the Senate Committee, "This Administration is committed to using all its tools to ensure that all schools comply with Title IX . . ." She further told the Committee: "If OCR cannot secure voluntary compliance from the recipient, OCR may initiate an administrative action to terminate and/or refuse to grant federal funds or refer the case to the DOJ to file a lawsuit against the school." Assistant Secretary Lhamon additionally stood behind the "April 2011 Dear Colleague Letter."

60.    Colleges and universities, including The Citadel, were fearful of and concerned about being investigated or sanctioned by the DOE and/or of potential Title IX lawsuits by the U.S. Department of Justice ("DOJ"). The White House issued a report entitled "Not Alone" in April 2014, which included a warning that if the OCR finds a Title IX violation, the "school risks losing federal funds," that the DOJ shares authority with OCR for enforcing Title IX and may initiate an investigation or compliance review of schools and that if a voluntary resolution cannot be reached, the DOJ may initiate litigation. In July 2016, Vice President Biden suggested that schools that do not comply with administration guidelines could be stripped of federal funding. "Obama, Biden Won't Visit Universities That Fall Short In Addressing Sexual Assault," Huffington Post, July 4, 2016 ("The vice president said he'd like to take away federal funding from those universities.")

61.    To revoke federal funds -- the ultimate penalty -- is a powerful tool because educational institutions receive billions of dollars a year from the federal government. Anne Neal of the American Council of Trustees and Alumni was quoted as follows: "There is a certain hysteria in the air on this topic, . . . It's really a surreal situation, I think." She explained that "schools are running so scared of violating the civil rights of alleged victims that they end up

violating the due process rights of defendants instead." "How Campus Sexual Assaults Came To Command New Attention," NPR, August 12, 2014.

62.    The DOE and OCR created a significant amount of pressure on colleges and universities to treat all those accused of sexual misconduct with a presumption of guilt. "Presumed Guilty: College men accused of rape say the scales are tipped against them," Chronicle of Higher Education, September 1, 2014. In the same article, the Chronicle noted that different standards were applied to men and women: "Under current interpretations of colleges' legal responsibilities, if a female student alleges sexual assault by a male student after heavy drinking, he may be suspended or expelled, even if she appeared to be a willing participant and never said no. That is because in heterosexual cases, colleges typically see the male student as the one physically able to initiate sex, and therefore responsible for gaining the woman's consent." "Presumed Guilty: College men accused of rape say the scales are tipped against them," Chronicle of Higher Education, September 1, 2014.

63.    Robert Dana, Dean of Students at the University of Maine, told NPR that some rush to judgment is inevitable. "I expect that that can't help but be true," he says. "Colleges and universities are getting very jittery about it." "Some Accused Of Sexual Assault On Campus Say System Works Against Them," NPR, September 3, 2014.

64.    In response to pressure from OCR, DOJ, and the Obama White House, educational institutions, such as Columbia, limited procedural protections afforded to male students, such as John Doe, in sexual misconduct cases.

D.    **The Department of Education Modifies Its Approach to Title
      IX Enforcement, Focusing on Fairness to All Parties.**

65.    In September 2017, the Department of Education took first steps toward restoring procedures that would provide basic fairness to both accusing and accused students in Title IX proceedings.

66.    Recognizing the harmful results of the April 2011 Dear Colleague Letter, the Secretary of Education Betsy DeVos observed that "[n]o school or university should deprive any student of his or her ability to pursue their education because the school fears shaming by—or loss of funding from—Washington," that "no student should be forced to sue their way to due process," and that "[o]ne person denied due process is one too many." On September 7, 2017, Department of Education Secretary Betsy DeVos denounced the campus sexual misconduct proceedings as denying    due    process    in    a    manner    that    is    wholly    un-American: www.ed.gov/news/speeches/secretary-devos-prepared-remarks-title-ix-enforcement. Included in Secretary DeVos's speech was the following:

> Washington's push to require schools to establish these quasi-legal structures to address sexual misconduct comes up short for far too many students.
> . . . .
>
> Through intimidation and coercion, the failed system has clearly pushed schools to overreach. With the heavy hand of Washington tipping the balance of her scale, the sad reality is that Lady Justice is not blind on campuses today. This unraveling of justice is shameful, it is wholly un-American, and it is anathema to the system of self-governance to which our Founders pledged their lives over 240 years ago.
> . . . .
>
> Schools have been compelled by Washington to enforce ambiguous and incredibly broad definitions of assault and harassment.

67.    Stating that "the era of 'rule by letter' is over" and "[t]here must be a better way forward," Secretary DeVos announced that the Department of Education would "launch a transparent notice-and-comment process to incorporate the insights of all parties" in an effort "to

[21]

ensure that America's schools employ clear, equitable, just, and fair procedures that inspire trust and confidence."

68.     Then, on September 22, 2017, the Department of Education announced that it was withdrawing the 2011 Dear Colleague Letter and the 2014 Questions & Answers on Title IX Sexual Violence, noting in part the criticism of those documents for placing "improper pressure upon universities to adopt procedures that do not afford fundamental fairness" and are "overwhelmingly stacked against the accused."

69.     This withdrawal effected a reversion to 2001 Department of Education guidance, which reads in relevant part: "The Constitution also guarantees due process to students in public and State-supported schools who are accused of certain types of infractions. The rights established under Title IX must be interpreted consistent with any federally guaranteed due process rights involved in a complaint proceeding."[5]

70.     A Q&A on Campus Sexual Misconduct, which the Department adopted the same day, reflects a return to the original principles of Title IX, the Clery Act, and their implementing regulations, stating among other things that "the burden is on the school—not on the parties—to gather sufficient evidence to reach a fair, impartial determination as to whether sexual misconduct has occurred…;" that "[a] person free of actual or reasonably perceived conflicts of interest and biases for or against any party must lead the investigation on behalf of the school;" that "[d]ecision-making techniques or approaches that apply sex stereotypes or generalizations may violate Title IX and should be avoided so that the adjudication proceeds objectively and impartially;" and that "[a]n equitable investigation of a Title IX complaint requires a trained investigator to analyze and document the available evidence to support reliable decisions, objectively evaluate the credibility

---

[5] Revised 2001 Department of Education Guidance, 19.

of parties and witnesses, synthesize all available evidence -- including both inculpatory and exculpatory evidence -- and take into account the unique and complex circumstances of each case."

71.    Despite a different direction announced by the current White House Administration, colleges and universities have mostly continued with practices and policies in place created to comply with the April 2011 Dear Colleague Letter resulting in gender biased enforcement of Title IX. Columbia is one such university. When new regulations were proposed, then Columbia VP Suzanne Goldberg stated that Columbia would "stick by its current standards"[6] and remain "vigilant" despite the 2017 revocation of "Dear Colleague" guidance.[7]

72.    On May 6, 2020, U.S. Secretary of Education Betsy DeVos announced new Title IX regulations. The U.S. Department of Education written announcement stated:

> The Final Rule requires schools to investigate and adjudicate formal complaints of sexual harassment using a grievance process that incorporates due process principles, treats all parties fairly, and reaches reliable responsibility determinations. A school's grievance process must:
>
> · Give both parties written notice of the allegations, an equal opportunity to select an advisor of the party's choice (who may be, but does not need to be, an attorney), and an equal opportunity to submit and review evidence throughout the investigation;
>
> · Use trained Title IX personnel to objectively evaluate all relevant evidence without prejudgment of the facts at issue and free from conflicts of interest or bias for or against either party;
>
> · Protect parties' privacy by requiring a party's written consent before using the party's medical, psychological, or similar treatment records during a grievance process;
>
> · Obtain the parties' voluntary, written consent before using any kind of "informal resolution" process, such as mediation or restorative justice, and not use an informal process where an employee allegedly sexually harassed a student;

---

[6] Valeria Escobar, "University pledges to maintain support for students as Trump administration announces new sexual misconduct rules," Columbia Daily Spectator, 11/20/2018.
[7] Aaron Holmes, " As Obama-era sexual assault policy is reversed, administrators vow to remain vigilant," Columbia Daily Spectator, 9/28/2017.

· Apply a presumption that the respondent is not responsible during the grievance process (often called a "presumption of innocence"), so that the school bears the burden of proof and the standard of evidence is applied correctly;

· Use either the preponderance of the evidence standard or the clear and convincing evidence standard (and use the same standard for formal complaints against students as for formal complaints against employees);

· Ensure the decision-maker is not the same person as the investigator or the Title IX Coordinator (i.e., no "single investigator models");

· For postsecondary institutions, hold a live hearing and allow cross-examination by party advisors (never by the parties personally); K-12 schools do not need to hold a hearing, but parties may submit written questions for the other parties and witnesses to answer;

· Protect all complainants from inappropriately being asked about prior sexual history ("rape shield" protections);

· Send both parties a written determination regarding responsibility explaining how and why the decision-maker reached conclusions;

· Effectively implement remedies for a complainant if a respondent is found responsible for sexual harassment;

· Offer both parties an equal opportunity to appeal;

· Protect any individual, including complainants, respondents, and witnesses, from retaliation for reporting sexual harassment or participating (or refusing to participate) in any Title IX grievance process;

· Make all materials used to train Title IX personnel publicly available on the school's website or, if the school does not maintain a website, make these materials available upon request for inspection by members of the public; and

· Document and keep records of all sexual harassment reports and investigations.

73.    The currently effective Title IX regulations require, among other things, equal access to evidence; a grievance procedure that includes a live hearing at which the decision-maker must permit each party's advisor to ask the other party and any witnesses all relevant questions and follow-up questions, including those questions challenging credibility. Such cross-examination at the live hearing must be conducted directly, orally, and in real time by the party's

advisor of choice and never by a party personally. Before a complainant, respondent, or witness answers a cross-examination or other question, the decision-maker must first determine whether the question is relevant and explain any decision to exclude a question that is ruled not relevant.

E.    **John Doe At The Citadel.**

74.    John Doe, who was on Marine scholarship, believed that Jane Roe was a friend in his class at The Citadel starting with their freshmen year, the 2018-2019 school year. At times, he would speak with Jane Roe in a friendly way, but it was always in the context of a class or in a school setting and never in a dating situation. John Doe thought that Jane Roe was attractive, but Jane Roe told John Doe that she was gay and had a girlfriend. Thereafter, the two still interacted as friends.

75.    At the start of the sophomore year, cadets could swear in the branch of the service they would enter upon graduation. For John Doe, that was the U.S. Marine Corps. In September 2019, John Doe did swear in the Marines.  He became aware, though, that Jane Roe did not. When John Doe asked her why not, he was received with some hostility.

76.    On October 18, 2019, Jane Roe filed her complaint with The Citadel, complaining about John Doe flirting with her the prior school year and accusing John Doe of three incidents. One alleged incident was at Jenkins Hall when John Doe assaulted her by grabbing her wrists, twisting them across her chest and forcing her against a wall; she said that a cadet "Sha" then came into Jenkins Hall and was a witness. The second alleged incident was at the Mess Hall when John Doe asked her why she was being rude to him and she said to John Doe to stay away from her, but John Doe reached in front of her to get a drink and rubbed against her. A third alleged incident was at the Law Barracks Sally Port where two weeks earlier from her complaint (which was early

October 2019) John Doe allegedly grabbed her butt and rubbed his front against her back while she was on duty with her female cadet friend "Er."

77.    John Doe denied these accusations in writing, asserting that he would not jeopardize his Marine scholarship by engaging in the accused behavior and that he would also not engage in the accused behavior because he was not raised that way. John Doe noted Jane Roe had told him she was gay but that the two had continued to interact as friends. John Doe said he was never in Jenkins Hall alone with Jane Roe, that all that happened was that he left Marine Study Hall with one of his fellow Marine cadets, saw Jane Roe in Jenkins Hall and stuck his head in (but did not go in) to ask how she was doing. John Doe also denied the alleged incident at the Law Barracks Sally Port and stated that he was requesting the video surveillance footage to show that the accusation was not true.

78.    Jane Roe, aware that John Doe had obtained the video surveillance footage of the Law Barracks Sally Port, changed the date of the alleged incident at that location to on or about September 12, 2019.

79.    On November 18, 2019, the Commandant's Board was convened. The Board consisted of Defendant Lieutenant Colonel Joel Fortenberry (President), Lieutenant Colonel Christopher Polites (Member), Cadet Captain Hannah Jalbert (Member), and Commander Kevin Adcock (Recorder). Commander Adcock had been the Battalion TAC Officer for Jane Roe in the 2018-2019 school year. Witnesses were not sworn under oath.

80.    At the Board proceeding, the Board permitted Jane Roe to cross-examine some of the John Doe's witnesses. Jane Roe used questions furnished to her from Defendant Shealy, who in contrast had not given any questions to John Doe to ask at the Board proceeding. A cadet "Rya" was a witness to the alleged incident at Jenkins Hall, but he said that John Doe never entered

Jenkins Hall but rather poked his head in to say hello. Cadet "Rya" also denied ever seeing John Doe have any physical contact with Jane Roe. The questioning by Jane Roe was aimed at undermining the testimony of Cadet "Rya," as it supported John Doe. Cadet "Er" said that John Doe did rub his front side against the backside of Jane Roe, but said she did not see John Doe grab Jane Roe's backside, contradicting Jane Roe's allegation on that point. Jane Roe during her testimony was asked by one of the Board members how she reacted or if she said anything when John Doe grabbed her back side and Jane Roe said she said "What the Hell." Butwhen Cadet "Er" was brought in to testify and one of the Board members asked Cadet "Er" if Jane Roe said anything after John Doe grabbed her back-side cadet "Er" said no she didn't hear Jane Roe say anything and in fact she (Cadet "Er") did not see John Doe grab Jane Roe's backside.

81.    Cadet "Noa" said that John Doe was at the Marine lab in the period 16:00-18:00; what that meant was that somehow John Doe had to be with Jane Roe by 18:00, a distinct improbability consistent with John Doe's denial of seeing Jane Roe that day; yet, the Board questions were aimed at establishing that somehow it was possible that John Doe did go by Jane Roe according to Jane Roe's accusation. Cadet "Sha" said that John Doe did not go into Jenkins Hall. Extensive questioning by Jane Roe aimed at, among other things, establishing "Sha" told her John Doe was a bad guy, but "Sha" did not recall saying anything like that and also said that he did not think John Doe would assault Jane Roe and that John Doe was a friendly guy. Jane Roe then gave her unsworn account in narrative form of the three alleged incidents: Jenkins Hall, Mess Hall and Law Barracks Sally Port. When Jane Roe was asked by John Doe's representative about "false memory," the Board President cut off the questioning.

82.    John Doe presented his case, starting with his own account: that he did not enter Jenkins Hall, just stuck his head in and said hello; that he denied the alleged Mess Hall incident;

[27]

and that he denied contact with Jane Roe at the Law Barracks Sally Port, that on the day in question, time he was coming from a Marine lab and his hands would not have been free to grope Jane Roe as he was carrying his Kevlar and rifle and that he had sought video surveillance which did not go back to September 12, 2019 -- Jane Roe conveniently changed the supposed date of the incident from a date in early October 2019 to on or about September 12, 2019 and video footage of the Law Barracks Sally Port was not available before early October 2019, which was deemed not relevant by the Board.  Board President Fortenberry asked John Doe a series of questions that Jane Roe had asked Cadet "Rya" aimed at ascertaining why John Doe did not stop talking to Jane Roe.  Character witnesses for John Doe said he would not have engaged in the alleged behavior.

83.    On December 18 2019, the decision of the Commandant's Board was issued. The Board ruled that it was more likely than not that John Doe committed an act of sexual violence in non-consensual physical contact of a sexual nature by rubbing his front side against the backside of Jane Roe at the Law Barracks Sally Port. The decision was purportedly based on judging Jane Roe and her female friend more credible than John Doe and the witnesses who had corroborated John Doe's account.

84.    That credibility determination, however, was made contrary to: (i) the change in Jane Roe's date of the alleged incident at the Law Barracks Sally Port from early October 2019 to September 12, 2019, that conveniently made unavailable video footage of the Law Barracks Sally Port; (ii) the difference between Jane Roe's complaint description of the incident (groping) to what the Commandant's Board supposedly found (rubbing up against); (iii) the non-acceptance of two of the three accusations made by Jane Roe; (iv) John Doe's consistent denial of all the accusations; (v) the witnesses for John Doe who denied that John Doe had engaged in the accused incidents and that they never saw John Doe engage in any sexual harassment or sexually violent behavior

toward Jane Roe; and (vi) John Doe's character witnesses. Trumping an objective assessment of the evidence was a "believe the woman" gender bias.

85.    On January 17, 2020, John Doe submitted a timely appeal that: (i) he was presenting new evidence in two additional cadets who were on guard duty on September 12, 2019, and whose eyewitness testimony refuted Jane Roe's story about John Doe engaging in sexual violence against her; (ii) CARE's Defendant Shealy did not provide a level playing field, as she was present for and assisted Jane Roe; (iii) there was a conflict of interest in Commander Adcock serving as the Board's recorder because he had been the Battalion TAC Officer for Jane Roe in the 2018-2019 school year; and (iv) there was a denial of due process stemming from the change in date of the alleged incident at the Law Barracks Sally Port.

86.    On February 3, 2020, John Doe's appeal was denied: (i) the new evidence was rejected on the stated grounds that John Doe could have presented it before and it was said not to change the Board's decision; (ii) the objection to the conduct of CARE's Defendant Shealy was rejected on the ground she had acted in keeping with CARE's mission; (iii) the objection to the conflict of interest in Commander Adcock serving as recorder for the Board was rejected on the ground that Commander Adcock, as recorder, was a non-voting member of the Board; and (iv) the due process objection was rejected on the stated grounds that the Board followed its rues and relied upon the eyewitness testimony of Cadet "Er" in reaching its decision.

87.    The stated grounds for denying John Doe's appeal were without merit. The new evidence would have made overwhelming the evidence against finding John Doe guilty of rubbing his front against Jane Roe's backside. Defendant Shealy's assistance to Jane Roe did create an uneven playing field that it was the responsibility of The Citadel under Title IX to address. There was at least an appearance of impropriety in having Jane Roe's former Battalion TAC Officer in

any capacity. The due process problem was not mitigated by the Board's reliance upon its own rules without regard to the requirements of constitutional due process and reliance upon Cadet "Er" because video surveillance footage was available for the date of the alleged Law Barracks Sally Port incident originally supplied by Jane Roe.

**F.    John Doe After Dismissal With Leave.**

88.    After the disciplinary decision, John Doe has worked in security, but his disciplinary record at The Citadel is following him around and causing him to have to explain the The Citadel disciplinary case to other schools to which was seeking admission and causing him to lose employment opportunities. As a consequence, John Doe has been suffering from ongoing injury from the discriminatory disciplinary decision rendered without proper constitutional due process.

**FIRST CAUSE OF ACTION**
**(42 U.S.C. § 1983: Denial of Fourteenth Amendment Due Process)**
**(Against Individual Citadel Defendants)**

89.    John Doe repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

90.    The Fourteenth Amendment to the United States Constitution provides that no state shall "deprive any person of life, liberty, or property, without due process of law." In this case, Defendants are state actors subject to the Fourteenth Amendment.

91.  Section 1983 of Title 42 of the U.S. Code provides in pertinent part:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . . .

92.    A person has a protected liberty interest in his good name, reputation, honor, and integrity coupled with a legal status ("stigma-plus") such that the person cannot suffer reputational injury and a change in legal status without due process. As a result, The Citadel could not take action, without due process of law, purportedly using Title IX procedures to inflict reputational injury on John Doe and lead to the damage of John Doe's legal status and loss of a Marine scholarship. *Doe v. Purdue*, 928 F.3d 652 (7th Cir. 2019) (Barrett, J.).

93.    A person has a protected property interest in preserving the benefits of his education, as well as in future educational and employment opportunities and occupational liberty, of which he cannot be deprived without due process. John Doe's constitutionally protected property interest further arises from the express and implied contractual relationship between The Citadel and John Doe. It is recognized by courts that Fourteenth Amendment due process protections are required in higher education disciplinary proceedings at public universities such as The Citadel. A person who has been admitted to a university and who has paid tuition to that university has a protected property interest in preserving the benefits of his education at that university. The state through the university cannot retroactively deprive a person of this interest without due process.

94.    John Doe was thus entitled to fundamentally fair procedures to determine whether he was responsible for the alleged sexual misconduct.

95.    In the course of such investigation and adjudication, The Citadel Defendants flagrantly violated John Doe's clearly established due process rights through their deprivation of the minimal requirements of procedural fairness by employing a process in which there was no presumption of innocence but rather a presumption that the accusations were true, there was no

real adherence to a burden of proof, and thus there was an effective discretion to engage in discriminatory decision-making.

96.    Cross-examination has been recognized as the greatest legal engine ever invented for discovery of the truth, *Lilly v. Virginia*, 527 U.S. 116, 124 (1999), and has been ruled to be required for basic due process in campus disciplinary cases, *Donohue v. Baker*, 976 F. Supp. 136 (N.D.N.Y. 1997). Yet, cross-examination here was cut off when it was done on behalf of John Doe.

97.    The Citadel Defendants, as were all administrators at colleges and universities, were pressured by the Obama Administration's DOE into following the Title IX investigative and adjudicatory process mandated by the April 2011 Dear Colleague Letter regardless of what otherwise would be due process considerations.

98.    Former Assistant Secretary Lhamon, during her tenure, made numerous public statements quoted above about the obligation of colleges and universities to conform to the April 2011 Dear Colleague Letter or face the cut-off of federal funding. The DOE and OCR have accordingly treated the April 2011 Dear Colleague Letter as binding on regulated parties for all practical purposes.

99.    The 2011 Dear Colleague Letter has in fact resulted in significant action and legal consequences. At the July 2014 Dartmouth College conference, Ms. Lhamon stated: "Our release of the 2011 DCL [Dear Colleague Letter] is widely credited with having sparked significant changes at colleges and universities as they worked to meet Title IX's requirements consistent with the 2011 DCL [Dear Colleague Letter]."

100.    As acknowledged by former Secretary DeVos, the April 2011 Dear Colleague Letter has negatively impacted the due process rights of those accused of sexual misconduct.

Significantly, Secretary DeVos proclaimed that the "era of 'rule by the letter' is over." The April 2011 Dear Colleague Letter has failed students and their institutions. "Every student accused of sexual misconduct must know that guilt is not predetermined." Most importantly, "any school that uses a system biased toward finding a student responsible for sexual misconduct also commits discrimination." Secretary DeVos stated: "Due process is the foundation of any system of justice that seeks a fair outcome. Due process either protects everyone, or it protects no one."

101.    The Citadel Defendants deprived John Doe of his liberty and property interests without affording him basic due process, including, but not limited to, his right to a fair adjudication free of bias, his right to be innocent until shown to be responsible and not to be subjected to the burden of proving innocence, his right to be heard by an impartial factfinder, to question his accuser, challenge the credibility of other adverse witnesses, present evidence and witnesses in support of his defense, be told of the decision rendered and to have the right of an appeal. As a result, The Citadel Defendants failed to provide John Doe with the basic due process protections that they are required to provide students accused of sexual misconduct at a state school.

102.    The Citadel Defendants, as well as other agents, representatives, and employees of The Citadel were acting under color of state law when they showed intentional and reckless disregard for John Doe's constitutional rights.

103.    The Citadel Defendants all agreed to, approved, and ratified this unconstitutional conduct.

85. Defendant General Glenn M. Walters is the President of The Citadel and is an appropriate person to be subject to injunctive relief for violations of due process; in his official capacity, he is responsibility for The Citadel's and operations as an educational institution of

higher learning, which includes compliance with federal and state laws and court decrees specific to The Citadel, including any expungement of a disciplinary record.

104.    Defendant Valerie Mercado is the current Title IX Coordinator at The Citadel and is an appropriate person to be subject to injunctive relief for violations of due process, including any expungement of a disciplinary record.

105.    Defendant Janet Shealy is the Director of CARE and is an appropriate person to be subject to injunctive relief for violations of due process, including any expungement of a disciplinary record.

106.    For a federal court injunction ordering prospective relief in a case involving a sexual misconduct disciplinary proceeding at the Citadel, joinder of Defendant President Walters, Defendant Mercado and Defendant Shealy in their respective official capacities is necessary so that the injunction is enforced.

107.    As a direct and proximate result of the above conduct, John Doe sustained and is sustaining ongoing injury, including, without limitation, reputational damage, emotional distress, loss of Marine scholarship, loss of military career opportunities, economic injuries and other direct and consequential damages. John Doe's interests in the results of the disciplinary process are significant.

108.    As a result of the foregoing, John Doe has standing to seek and is entitled to an injunction vacating John Doe's disciplinary findings and decision, granting expungement of John Doe's transcript of the disciplinary record, ordering the ending of the dismissal with leave.

109.    As a result of the foregoing, John Doe is entitled to an injunction enjoining ongoing violations of the Fourteenth Amendment in the process of investigating and adjudicating sexual misconduct complaints against John Doe and to attorneys' fees, expenses, costs and disbursements.

## SECOND CAUSE OF ACTION
## (Violation of Title IX of the Education Amendments of 1972)
### (Against Defendant The Citadel)

110.    John Doe repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

111.    Title IX of the Education Amendments of 1972 provides, in relevant part, that:

No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

112.    Title IX of the Education Amendments of 1972 applies to an entire school or institution if any part of that school receives federal funds; hence, athletic programs are subject to Title IX of the Education Amendments of 1972 even though there is very little direct federal funding of school sports. The Citadel receives federal funding and has acknowledged that it is subject to Title IX.

113.    Title IX may be violated by a school's failure to prevent or remedy sexual harassment or sexual assault or by the imposition of university discipline where gender is a motivating factor in the decision to discipline. In either case, the statute is enforceable through an implied private right of action.

114.    The practical reason why due process matters is so that cases are not decided "on the basis of an erroneous or distorted conception of the law or the facts." *Marshall v. Jerrico, Inc.*, 446 U.S. 238, 242 (1980). Former DOE Secretary DeVos has stressed the importance of due process in Title IX investigations and adjudications. "Every student accused of sexual misconduct must know that guilt is not predetermined." Most importantly, "any school that uses a system biased toward finding a student responsible for sexual misconduct also commits discrimination." Former DOE Secretary DeVos stated: "Due process is the foundation of any system of justice that

seeks a fair outcome. Due process either protects everyone, or it protects no one." The Citadel procedures are biased towards finding accused male students responsible and provide inadequate due process protections for cadets accused of sexual misconduct.

*115.*    A number of U.S. Courts of Appeals, following the lead of Judge (now Justice) Amy Coney Barrett for the U.S. Court of Appeals for the Seventh Circuit in *Doe v. Purdue*, 928 F.3d 652 (7th Cir. 2019), ask the simple question does the evidence show the plaintiff was discriminated against on the basis of sex? See *Doe v. Univ. of Sciences,* 961 F.3d 203 (3d Cir. 2020); *Doe v. Univ. of Arkansas - Fayetteville*, 974 F.3d 858 (8th Cir. 2020); *Doe v. Oberlin Coll.*, 963 F.3d 580, 588 (6th Cir. 2020); *Schwake v. Arizona Bd. of Regents*, 967 F.3d 940 (9th Cir. 2020). A few other U.S. Courts of Appeal follow the classifications of Title IX discrimination actions challenging university disciplinary proceedings for sex discrimination identified in *Yusuf v. Vassar*, 35 F.3d 709, 715 (2d Cir. 1994): (1) "erroneous outcome" cases, in which the claim is that plaintiff was innocent and wrongly found to have committed an offense and gender bias was a motivating factor behind the erroneous findings; and (2) "severity of penalty/selective initiation" cases, in which the claim asserts that, regardless of the student's guilt or innocence, the severity of the penalty and/or decision to initiate the proceeding was affected by the student's gender.

116.    The "believe the woman" bias evidenced in the Commandant's Board proceeding and the disposition of John Doe's appeal demonstrated that John Doe was discriminated against on the basis of sex. The "believe the woman" bias was reinforced by the fact that John Doe is of African-American and Italian ancestry and Jane Roe is white.

117.    An "erroneous outcome" occurred in this case because John Doe was not guilty of sexual misconduct and John Doe wrongly found to have committed an act of sexual violence and gender bias was a motivating factor.

118.    The Citadel failed to conduct an adequate, reliable, and impartial investigation when it investigated and adjudicated the allegations against John Doe in a manner that was biased against him. Critically, The Citadel failed to allow for cross-examination by John Doe's representative despite the she said/he said nature of the case.

119.    The Citadel has created a victim-centered process in which an accused male student is prosecuted under a presumption of guilt. This one-sided process has deprived John Doe, as a male student, of the benefits of his education at The Citadel.

120.    In *Menaker v. Hofstra*, 935 F.3d 20, 34 (2d Cir. 2019), the Second Circuit identified "irregularities" that pointed to gender bias:

> [W]e need not define precisely what sort of irregularities meet the standard of "clearly irregular investigative or adjudicative process." But we note that *Doe v. Columbia* [, 831 F.3d 46, 57 (2d Cir. 2016),] offers some guidance on this issue. For instance, "[w]hen the evidence substantially favors one party's version of a disputed matter, but an evaluator forms a conclusion in favor of the other side (without an apparent reason based in the evidence), it is plausible to infer (although by no means necessarily correct) that the evaluator has been influenced by bias."

The evidence presented at the Commandant's Board proceeding substantially favored John Doe's version, but the Board engaged in extensive questioning of witnesses seeking to establish that somehow it was possible Jane Roe's accusations were true and in the end stated a conclusion in favor of Jane Roe contrary to the weight of the evidence. On appeal, the additional new evidence and the conflict of interest favored reversal in favor of John Doe, but the appeal was denied.

121.    The totality of the circumstances establish that The Citadel discriminated unlawfully under Title IX in reaching the "erroneous outcome." The Citadel credited a false accusation of sexual violence, presumed that those allegations to be true rather than properly applying the preponderance of the evidence standard and required no reasoned consideration of evidence as required by a burden of proof.

[37]

122.    Male respondents in sexual misconduct cases at The Citadel are discriminated against solely on the basis of sex. They are invariably found guilty, regardless of the evidence, or lack thereof.

123.    As a direct and proximate result of the above conduct, John Doe sustained tremendous damages, including, without limitation, emotional distress, loss of Marine scholarship, loss of career opportunities, economic injuries and other direct and consequential damages.

124.    As a result of the foregoing, John Doe is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements and to an injunction enjoining violations of the Title IX in the process of investigating and adjudicating sexual misconduct complaints.

## **PRAYER FOR RELIEF**

**WHEREFORE**, for the foregoing reasons, Plaintiff John Doe demands judgment against The Citadel Defendants as follows:

(i)    on the first cause of action for violation of constitutional due process under 42 U.S.C. § 1983, a judgment against Defendants Walters, Fortenberry, and Shealy awarding John Doe an injunction ordering the vacating of the dismissal with no readmission requirements, vacating Plaintiff John Doe's disciplinary findings and decision, granting expungement of the disciplinary record from Plaintiff John Doe's school records at The Citadel; and

(ii)    on the second cause of action for violation of Title IX of the Education Amendments of 1972, a judgment against Defendant The Citadel awarding Plaintiff John Doe:

(a)    damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and athletic opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, and

(b)    an injunction directing The Citadel to vacate the dismissal with no readmission requirements, vacate Plaintiff John Doe's disciplinary

findings and decision, and expunge the disciplinary record from Plaintiff John Doe's school records, and

(iii)    awarding Plaintiff John Doe such other and further relief as the Court deems just, equitable and proper, including attorneys' fees.

## JURY DEMAND

**PLAINTIFF JOHN DOE**, through his attorneys, hereby demands a trial by jury of all claims and issues triable by jury.

Dated: December 22, 2021                    Respectfully submitted,

**LAW OFFICES OF DAVID AYLOR**
**24 Broad St.**
**Charleston, South Carolina 29401**
**(843) 577-5530**
david@davidaylor.com

/s/ *Stephen Schmutz*
**LAW OFFICES OF STEPHEN SCHMUTZ**
**24 Broad St.**
**Charleston, South Carolina 29401**
**(843) 577-5530**
steve@schmutzlaw.com

-and-

**NESENOFF & MILTENBERG, LLP**

/s/ *Philip A. Byler*
**Philip A. Byler, Esq.**
**Andrew T. Miltenberg, Esq.**
**363 Seventh Avenue, Fifth Floor**
**New York, New York 10001**
**(212) 736-4500**
pbyler@nmllplaw.com
amiltenberg@nmllplaw.com
(***PRO HAC VICE* ADMISSIONS PENDING**)

**Attorneys for Plaintiff John Doe**

[39]