**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**CHARLESTON DIVISION**

| | | |
|---|---|---|
| **JOHN DOE,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Index No. 2:21-cv-04198-DCN** |
| **THE CITADEL, THE MILITARY COLLEGE** | ) | |
| **OF SOUTH CAROLINA, GLENN M.** | ) | |
| **WALTERS, in his official capacity at The** | ) | |
| **Citadel, VALERIE MERCADO, in her official** | ) | |
| **capacity at The Citadel, and JANET SHEALY,** | ) | |
| **in her official capacity at The Citadel,** | ) | |
| | ) | |
| **Defendants.** | ) | |

-----------------------------------------------------------

**PLAINTIFF'S MEMORANDUM OF LAW**
**IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

Plaintiff John Doe, a pseudonym ("John Doe") respectfully submits this Memorandum of

Law in opposition to Defendants' Rule 12(b)(6) motion to dismiss John Doe's Complaint. John

Doe has well pleaded violations of constitutional due process and Title IX sex discrimination in

the erroneous expulsion/suspension of him for alleged sexual misconduct that he did not commit.

Defendants' motion should be denied.  Defendants' six grounds asserted for it are without merit.

## <u>SUMMARY OF ARGUMENTS</u>

1.      John Doe has properly brought a due process claim per *Ex Parte Young*, 209 U.S.

123 (1908), against certain officers of Defendant The Citadel in their respective official capacities

for prospective injunctive relief to remedy the ongoing harm from the erroneously imposed

discipline costing John Doe, among other things, his Marine scholarship in violation of due

process. (Docket Entry 1: Cmplt. ¶¶ 1, 88, 108, Prayer For Relief (i).)  Defendants' effort to treat

expungement as a retrospective remedy is contrary to considered case law.  In *Doe v. Purdue*, 928

F.3d 652, 666-667 (7th Cir. 2019), then Judge (now Justice) Barrett for the Seventh Circuit ruled that expungement was proper prospective injunctive relief to remedy ongoing injury, citing among other cases, *Shepard v. Irving*, 77 F. App'x 615, 620 (4th Cir. 2003) [Ex. A], and directed the District Court to consider expungement of the respondent student's disciplinary record on remand. Defendants' cited cases in the Fourth Circuit cases are inapposite, not involving the remedying of ongoing injury from a college or university disciplinary process.

2.    For prospective injunctive relief per *Ex Parte Young*, the required individual participation of the Defendant officers is in connection with the ongoing constitutional violation or unconstitutional law.  What is required, then, for *Ex Parte Young* suits is that the named Defendant officers in their official capacities be in positions to act with respect to the ongoing violation or unconstitutional law.  Sometimes university Chancellors and Presidents are the named individual defendant.  Defendants' cited cases are misread.

3.    For prospective injunctive relief suits brought under *Ex Parte Young* to remedy ongoing injury, a "policy or custom" is not required.  That requirement is for damage suits under 42 U.S.C. §1983 against government entities such as municipalities per *Monell v. Dep't of Social Services of N.Y.C.*, 436 U.S. 658 (1978).  Again, Defendants' cited cases are misread.

4.    Because John Doe has property and liberty interests (Defendants do not concede but do not contest the point), John Doe has more than plausibly alleged that he was denied due process. John Doe was not afforded "a fair opportunity to be heard" by an impartial tribunal: there was a lack of due process required impartiality in the hearing; there was assistance at the hearing that was provided to Jane Roe by Defendant Janet Shealy but was not provided to John Doe; there was in fact a non-existent opportunity to cross-examine John Doe's accuser; there was arbitrary and capricious decision-making for the female Jane Roe contrary to the overwhelming weight of

the evidence; there was no presumption of innocence but rather a presumption that the accusations were true.  Due process matters so that cases are not decided "on the basis of an erroneous or distorted conception of the law or the facts." *Marshall v. Jerrico, Inc.*, 446 U.S. 238, 242 (1980).

5.     John Doe has alleged facts that more than raise a plausible inference that Defendant The Citadel discriminated against John Doe on the basis of sex. *Doe v. Purdue*, 928 F.3d 652, 667-668.  This is a "she said/he said" case over alleged sexual violence (brief unwanted sexual contact); two of the three accusations were so unfounded that they had to be rejected; the third accusation that was sustained depended upon Jane Roe's changing the date of the incident to avoid objective evidence in video surveillance tape disproving it.  A reading of paragraphs 2-5 and 74-88 of the Complaint (Docket Entry 1 ¶¶ 2-5, 74-88) lays out the basic facts of the case; the procedural and adjudicative irregularities and the decision-making contrary to the evidence here establish the gender bias. (Docket Entry 1: Cmplt. ¶ 20.)  *Menaker v. Hofstra*, 935 F.3d 20, 34 (2d Cir. 2019); *Doe v. Columbia*, 836 F.3d 46, 57 (2d Cir. 2016); *Doe v. Univ. of Arkansas-Fayetteville*, 974 F.3d 858, 864 (8th Cir. 2020).  The Complaint further pleads that "believe the woman gender bias" and "pro-victim bias" explain the procedural and adjudicative irregularities and the decision-making contrary to the evidence.  (Docket Entry 1: Cmplt. ¶¶ 4, 5, 116, 119.)  Defendants' assertion that allegations of "believe the woman gender bias" and "pro-victim bias" are insufficient to support a case of sex discrimination, even against a motion to dismiss, is an illogical denial of the well pleaded gender bias here and cannot be rationalized away given the rules governing motions to dismiss and a careful reading of the cases.  In the context of campus sexual misconduct proceedings, the "victim" is the "woman" who is to be "believe[d]".  The Complaint pleads, citing a United Educators study, that in these campus sexual proceedings, 99% of university complainants are female and 99% of respondents are male. (Docket Entry 1: Cmplt. ¶ 37.) The

relevance of the 2011 Dear Colleague Letter is the "backdrop" in alleging a plausible Title IX case alleging other facts showing discrimination. *Doe v. Purdue*, 928 F.3d at 668-669.

6.    Pseudonym treatment of "John Doe" and "Jane Roe" is justified per *James v. Jacobson*, 6 F.3d 233, 238 (4th Cir. 1993), and per the current case law around the country finding that in the circumstances of challenging a college sexual misconduct proceeding, so as to maintain the litigation status quo of anonymity in cases arising out of a confidential university disciplinary process, the requisite factors for pseudonym treatment exist. The decisions applying the factors for pseudonym treatment and granting pseudonymity in *Doe v. Colgate*, 2016 WL 1448829 (N.D.N.Y. Apr. 12, 2016) [Ex. B], *Doe v. Purdue,* 321 F.R.D. 339 (N.D. Ind. 2017), and *Doe v. Trustees of Dartmouth College*, 2018 WL 2048385 (D.N.H. May 2, 2018) [Ex. C], are instructive.

## THE ALLEGATIONS OF THE COMPLAINT

John Doe's Complaint (Docket Entry 1) at paragraphs 14-73 alleges the facts as to the federal regulatory environment to campus sexual misconduct tribunals and at paragraphs 1-5 and 74-88 sets forth the basic facts as to what happened in the case.

John Doe's case is stated in paragraph 1 of the Complaint:

> This constitutional due process and Title IX action is brought on behalf of Plaintiff John Doe ("John Doe"), who was a scholarship cadet at The Citadel, The Military College of South Carolina ("The Citadel") until he was dismissed with leave to apply for possible readmission after one year because he was found, erroneously, to have committed an act of sexual violence in non-consensual physical contact of a sexual nature by rubbing his front side against the backside of a female cadet Jane Roe and touching her buttocks at the Law Barracks Sally Port in violation of Class I, Code 410 of The Citadel. As a result, John Doe lost his Marine scholarship which he needed to attend The Citadel, presently cutting him off from his hope and dream of becoming a military officer, and John Doe has further been denied employment positions and has had to explain to other schools to which he was seeking admission what happened at The Citadel with respect to the disciplinary case. John Doe, however, did not commit the act of which he was accused.

(Docket Entry 1: Cmplt. ¶ 1.)

[4]

Defendants' "Background" statement in its Memorandum of Law at pages 2-5 skips over the federal regulatory background, which includes how the April 2011 Dear Colleague Letter provided females what was unjustified preferential treatment, and instead jumps to reviewing the Complaint's allegations about the basic facts, albeit with some omissions worth noting.

**A.** **Jane Roe's Accusations and John Doe's Denials.**

Defendants omit that in response to Jane Roe's college complaint about alleged incidents at the Mess Hall, Jenkins Hall and the Law Barracks Sally Port, when John Doe denied the accusations about all three incidents in writing, John Doe additionally asserted: (i) that he would not jeopardize his Marine scholarship by engaging in the accused behavior; (ii) that he would also not engage in the accused behavior because he was not raised that way; and (iii) that he was never in Jenkins Hall alone with Jane Roe, that all that happened was that he left Marine Study Hall with one of his fellow Marine cadets, he saw Jane Roe in Jenkins Hall and stuck his head in (but did not go in) to ask how she was doing.  (Docket Entry 1: Cmplt. ¶ 77.)  Defendants do acknowledge that John Doe requested surveillance footage at the Law Barracks Sally Port to show the accusation, originally said to have occurred in early October 2019, was not true; however, in response, Jane Roe changed the date of the incident to on or about September 12, 2019 when surveillance footage was not available.  (Df. Mem. 2; Docket Entry 1: Cmplt. ¶¶ 78, 81.)

**B.** **The Board Hearing.**

Defendants omit that at the Board hearing: (i) when Cadet "Noa" said that John Doe was at the Marine lab in the period 16:00-18:00 and that meant was that somehow John Doe had to be with Jane Roe by 18:00, a distinct improbability consistent with John Doe's denial of seeing Jane Roe that day at the Law Barracks Sally Port, the Board questions were still aimed at establishing that somehow it was possible that John Doe did go by Jane Roe according to Jane Roe's accusation;

and (ii) when Cadet "Sha" said that John Doe did not go into Jenkins Hall, there was extensive questioning by Jane Roe aimed at, among other things, establishing "Sha" told her John Doe was a bad guy, but "Sha" did not recall saying anything like that and also said that he did not think John Doe would assault Jane Roe and that John Doe was a friendly guy.  (Docket Entry 1: Cmplt. ¶ 81.) Defendants do acknowledge that Jane Roe gave an unsworn account of the three alleged incidents and that when John Doe's representative asked Jane Roe about "false memory," the Board President cut off questioning.  (Df. Mem. 3; Docket Entry 1: Cmplt. ¶ 81.)

Defendants acknowledge that John Doe presented his case, starting with his own account: that he did not enter Jenkins Hall, just stuck his head in and said hello; that he denied the alleged Mess Hall incident; and that he denied contact with Jane Roe at the Law Barracks Sally Port, that on the day in question with regard to Law Barracks Sally Port, time he was coming from a Marine lab and his hands would not have been free to grope Jane Roe as he was carrying his Kevlar and rifle and that he had sought video surveillance which did not go back to September 12, 2019 -- Jane Roe changed the date of the incident from a date in early October 2019 to on or about September 12, 2019 and video footage of the Law Barracks Sally Port was not available before early October 2019.  Defendants acknowledge that character witnesses for John Doe said he would not have engaged in the alleged behavior.  (Df. Mem. 3; Docket Entry 1: Cmplt. ¶ 82.)

Defendants omit, however: (i) that Board deemed not relevant that Jane Roe changed the supposed date of the incident from a date in early October 2019 to on or about September 12, 2019 and video footage of the Law Barracks Sally Port was not available before early October 2019; and (ii) that Board President Fortenberry asked John Doe a series of questions that Jane Roe had asked Cadet "Rya" aimed at ascertaining why John Doe did not stop talking to Jane Roe.  (Df. Mem. 3; Docket Entry 1: Cmplt. ¶ 82.)

[6]

C.  **The Board Ruling.**

Defendants acknowledge that the Board ruled that it was more likely than not that John Doe committed an act of sexual violence in non-consensual physical contact of a sexual nature by rubbing his front side against the backside of Jane Roe at the Law Barracks Sally Port and that the decision was purportedly based on judging Jane Roe and her female friend more credible than John Doe and the witnesses who had corroborated John Doe's account.  But the Board's credibility determination was made contrary to: (i) the change in Jane Roe's date of the alleged incident at the Law Barracks Sally Port from early October 2019 to September 12, 2019, that conveniently made unavailable video footage of the Law Barracks Sally Port; (ii) the difference between Jane Roe's complaint description of the incident (groping) to what the Commandant's Board supposedly found (rubbing up against); (iii) the non-acceptance of two of the three accusations made by Jane Roe; (iv) John Doe's consistent denial of all the accusations; (v) the witnesses for John Doe who denied that John Doe had engaged in the accused incidents and that they never saw John Doe engage in any sexual harassing or sexually violent behavior toward Jane Roe; and (vi) John Doe's character witnesses.  (Dfs. Mem. 4; Docket Entry 1: Cmplt. ¶¶ 83-84.)

Defendants acknowledge that the Complaint alleges that the Commandant Board made a "believe in the woman" gender biased decision (Dfs. Mem. 4); the Complaint says it was not "an objective assessment of the evidence" (Docket Entry 1: Cmplt. ¶ 84).  John Doe was dismissed from The Citadel with leave to re-apply in one year; but as a result of the dismissal, John Doe lost his Marine scholarship which he needed to attend the school.  (Docket Entry 1: Cmplt. ¶ 1.)

D.  **John Doe's Appeal.**

Defendants also acknowledge that John Doe submitted a timely appeal that: (i) he was presenting new evidence in two additional cadets who were on guard duty on September 12, 2019,

[7]

and whose eyewitness testimony refuted Jane Roe's story about John Doe engaging in sexual violence against her; (ii) CARE's Defendant Shealy did not provide a level playing field, as she was present for and assisted Jane Roe; (iii) there was a conflict of interest in Commander Adcock serving as the Board's recorder because he had been the Battalion TAC Officer for Jane Roe in the 2018-2019 school year; and (iv) there was a denial of due process stemming from the change in date of the alleged incident at the Law Barracks Sally Port. (Df. Mem. 4; Docket Entry 1: Cmplt. ¶ 85.)

Defendants further acknowledge that John Doe's appeal was denied: (i) the new evidence was rejected on the stated grounds that John Doe could have presented it before and it was said not to change the Board's decision; (ii) the objection to the conduct of CARE's Defendant Shealy was rejected on the ground she had acted in keeping with CARE's mission; (iii) the objection to the conflict of interest in Commander Adcock serving as recorder for the Board was rejected on the ground that Commander Adcock, as recorder, was a non-voting member of the Board; and (iv) the due process objection was rejected on the stated grounds that the Board followed its rules and relied upon the eyewitness testimony of Cadet "Er" in reaching its decision. (Df. Mem. 4; Docket Entry 1: Cmplt. ¶ 86.)

Defendants omit, however, the stated grounds in the Complaint for why the denial of John Doe's appeal were without merit: (i) the new evidence in two additional cadets who were on guard duty on September 12, 2019, and whose eyewitness testimony refuted Jane Roe's story about John Doe engaging in sexual violence against her would have made overwhelming the evidence against finding John Doe guilty of rubbing his front against Jane Roe's backside; (ii) the assistance of CARE's Defendant Shealy to Jane Roe created an uneven playing field that it was the responsibility of The Citadel under Title IX to address; (iii) there was at least an appearance of

impropriety in having Jane Roe's former Battalion TAC Officer function in any capacity in the disciplinary proceeding; (iv) the due process problem of changing the date of the alleged Sally Port incident was not mitigated by the Board's reliance upon its own rules without compliance with the requirements of constitutional due process; and (v) reliance upon the purported eyewitness testimony of Cadet "Er" was not justified because video surveillance footage was available for the date of the alleged Law Barracks Sally Port incident originally supplied by Jane Roe.    (Docket Entry 1: Cmplt. ¶ 87.)

### E.  Ongoing Injury.

Defendants omit that after the disciplinary decision, John Doe lost his Marine scholarship that had enabled him to attend The Citadel, and his disciplinary record at The Citadel is causing him to have to explain the disciplinary case, causing him to lose education and employment opportunities and causing him to suffer ongoing injury. (Docket Entry 1: Cmplt. ¶¶ 1, 88.)

### F.  John Doe's Causes of Action.

Defendants acknowledge that John Doe pleads two causes of action: the First Cause of Action is for 42 U.S.C. § 1983 denial of Fourteenth Amendment due process against individual Defendants Walters, Mercardo and Shealy; and the Second Cause of Action is for Title IX sex discrimination against Defendant The Citadel. (Dfs. Mem. 5; Docket Entry 1: Cmplt. ¶¶ 89-124.)

## LEGAL STANDARD

Defendant have moved under Rule 12(b)(6) of the Federal Rules of Civil Procedure, the basic rule for which is that the Court must "accept[] all well-pleaded allegations in the plaintiff's Complaint as true and draw all reasonable inferences from those facts in plaintiff's favor" to determine whether plaintiff can proceed with his causes of action. *Edwards v. City of Goldsboro*, 178 F.3d 231, 244 (4th Cir. 1999). *See Doe v. Columbia*, 831 F.3d 46, 48-49 (2d Cir. 2016) ("[T]he

court, in judging the sufficiency of the complaint, must accept the facts alleged and construe ambiguities in the light most favorable to upholding the plaintiff's claim. . . . [Thus] we set forth below facts alleged in Plaintiff's Complaint in the light most favorable to him, drawing reasonable inferences in his favor.")

The U.S. Supreme Court in *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007), stated that a plaintiff must plead sufficient factual allegations "to state a claim to relief that is plausible on its face." The U.S. Supreme Court followed up in *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), distinguishing between conclusory allegations not entitled to be assumed as true and factual allegations entitled to be treated as true for the purposes of the motion; the Supreme Court then inquired whether the facts assumed to be true states a claim for relief that is plausible on its face, stating that "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." 556 U.S. at 678.

The key to the rules governing motions to dismiss is that they be properly applied, which Defendants do not do with respect to John Doe's 39-page Complaint, which is not conclusory but does detail factual allegations to support his causes of action. *Twombly* and *Iqbal* do not justify ignoring pleaded facts supporting finding due process violations and sex discrimination.

## LEGAL ARGUMENT

**I.    JOHN DOE'S COMPLAINT PROPERLY PLEADS A DUE PROCESS CLAIM PER *EX PARTE YOUNG*, 209 U.S. 123 (1908), AGAINST CERTAIN OFFICERS OF DEFENDANT THE CITADEL IN THEIR OFFICIAL CAPACITIES FOR PROSPECTIVE INJUNCTIVE RELIEF TO REMEDY ONGOING HARM FROM ERRONEOUSLY IMPOSED DISCIPLINE IN VIOLATION OF DUE PROCESS.**

As stated in the Summary of Argument (pp. 1-2), John Doe has pleaded a due process claim per *Ex Parte Young*, 209 U.S. 123 (1908), against certain officers of Defendant The Citadel in their

respective official capacities in order to obtain prospective injunctive relief to remedy the ongoing

harm from the discriminatory erroneously imposed discipline in violation of due process.  In

addressing this issue, Defendants provide an inadequate summary of John Doe's due process cause

of action (Dfs. Mem. 7); however, John Doe's due process cause of action is better discussed in

Part II of the Legal Argument here below and the merits of the cause of action are apparent.

Defendants assert three specific arguments against John Doe's cause of action seeking

prospective injunctive relief -- that John Doe seeks retrospective relief, that the individual

participation of the Defendant officers in the alleged wrongdoing is not alleged, and that a "policy

or custom" is not alleged.  All three arguments are without merit: (A) John Doe seeks prospective

injunctive relief from ongoing harm; (B) the proper defendants in an *Ex Parte Young* suit are

individuals in their official capacities who can effectuate a federal court order; and (C) a "policy

or custom" is not required for prospective injunctive relief suits per *Ex Parte Young*, but is required

for damage suits under 42 U.S.C. §1983 against government entities such as municipalities per

*Monell v. Dep't of Social Services of N.Y.C.*, 436 U.S. 658 (1978).

**A.      John Doe's § 1983 Due Process Cause of Action Properly
Seeks Prospective Relief To Remedy Ongoing Injury.**

Defendants begin their discussion of § 1983 liability by asserting that John Doe has only

sued individual Defendants Walters, Mercado and Shealy in their official capacities. (Dfs. Mem.

8.)  The problem with that statement is that it omits that John Doe has sued individual Defendants

Walters, Mercado and Shealy in *their official capacities for prospective injunctive relief to remedy

ongoing injury.*  (Docket Entry 1: Cmplt. ¶¶ 88, 108, Prayer For Relief (i).)

Defendants' approach sets up Defendants' citation of *Will v. Michigan Dep't of State

Police*, 491 U.S. 58 (1989), *DeCecco v. University of S.C.*, 918 F.Supp.2d 471 (D.S.C. 2013), and

*Scott v. Ozmint*, 467 F.Supp.2d 564 (D.S.C. 2006), which do hold that that a State and its officials

acting in their official capacities are not persons under § 1983. (Dfs. Mem. 8.) Defendants then acknowledge is that a state official in his or her official capacity, when sued for injunctive relief, would be a person under § 1983, citing *Will v. Michigan Dep't of State Police*, 491 U.S. at 94 n.10, *Ex Parte Young* and *Lyle v. Griffith*, 240 F.3d 404, 408 (4th Cir. 2001). (Dfs. Mem. 9.) Defendants acknowledge a plaintiff may seek prospective injunctive relief. (Dfs, Mem. 9.) Defendants do not acknowledge that John Doe has sued for prospective injunctive relief, which is to remedy ongoing injury per *Ex Parte Young*. (Docket Entry 1: Cmplt. ¶¶ 88, 108, Prayer For Relief (i).)

Instead, Defendants assert, incorrectly, that John Doe's request for injunctive relief is retrospective, citing one Fourth Circuit case and two District Court cases in the Fourth Circuit. These cases are very inapposite, not remotely involving the remedying of ongoing injury from a college or university disciplinary process. In *Republic of Paraguay v. Allen*, 134 F.3d 622 (4th Cir. 1998), the claim was the failure to advise a convicted Paraguayan national of treaty rights, which the Fourth Circuit ruled did not entail ongoing injury per *Ex Parte Young*. In *Charnock v. Virginia*, 2017 U.S. Dist. LEXIS 172629 (E.D. Va. Jan. 4, 2017) [Ex. D], the plaintiff collaterally attacked judicial rulings in his divorce proceedings as violations of due process, seeking a declaration that past orders and rulings were erroneous; thus, under the authority of *Republic of Paraguay v. Allen*, it was not a case seeking prospective injunctive relief to remedy ongoing injury per *Ex Parte Young*. In *Jemsek v. North Carolina Med. Bd.*, 2017 U.S. Dist. LEXIS 23570 (E.D. N.C. Feb. 20, 2017) [Ex. E], a doctor sued the North Carolina Medical Board, a state agency, and its current and former Board members for conspiring to violate the antitrust Sherman Act by maintaining an Order constricting his license to practice and by engaging in price fixing, but the Court ruled that the suit was barred by the Eleventh Amendment and did not involve ongoing federal law violations and injury so as to trigger application of *Ex Parte Young*.

[12]

Defendants' polemical effort (Dfs. Mem. 10) to treat as a retrospective remedy John Doe's request for prospective injunctive relief is simply contrary to considered case law.  In *Doe v. Purdue*, 928 F.3d 652, 666-667 (7th Cir. 2019), where the John Doe in that case lost his Navy scholarship, then Judge (now Justice) Barrett for the Seventh Circuit ruled that expungement was proper prospective injunctive relief to remedy ongoing injury, citing among other cases, *Shepard v. Irving*, 77 F. App'x 615, 620 (4th Cir. 2003) [Ex. A], and directed the District Court to consider expungement of the respondent's disciplinary record on remand.  Here, John Doe likewise seeks the disciplinary findings and decision vacated and the disciplinary record at Defendant The Citadel expunged.  (Docket Entry 1: Cmplt. ¶¶ 88, 108, Prayer For Relief (i).)

Judge Barrett's opinion was solidly supported by case law.  Where a student has been erroneously disciplined in violation of constitutional due process and/or Title IX with continuing, present adverse effects, the federal courts have the power to order prospective injunctive relief to address the "continuing, present adverse effects." *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983).  Application of *Ex Parte Young* has been widely recognized to authorize injunctive relief to clear a student's academic record: *Doe v. Cummins*, 662 F. App'x 437, 444 (6th Cir. 2016) [Ex. F]; *Flint v. Dennison*, 488 F.3d 816, 825 (9th Cir. 2007); *Shepard v. Irving*, 77 F. App'x at 620 (failing grade and plagiarism record constituted ongoing injury and were expunged) [Ex. A]; *Thomson v. Harmony*, 65 F.3d 1314, 1321 (6th Cir. 1995); *Johnson v. Western State Colorado University*, 71 F. Supp.3d 1217, 1230 (D. Colo. 2014).  Prospective injunctive relief has been recognized in other contexts as well.  In *Elliott v. Hinds*, 786 F.2d 298, 302 (7th Cir. 1986), the Seventh Circuit ruled:

> The injunctive relief requested here, reinstatement and expungement of personnel records, is clearly prospective in effect and thus falls outside the prohibitions of the Eleventh Amendment. The goal of reinstatement and the removal of damaging information from the plaintiff's work record is not compensatory; rather, it is to

compel the state official to cease her actions in violation of federal law and to comply with constitutional requirements.

*Accord*: *Scherer v. Marriott Int'l Inc.*, 703 F.3d 1069, 1074 (7th Cir. 2013) (prospective injunctive relief to remedy ongoing violations of the American Disabilities Act at a hotel); *Wolfel v. Morris*, 972 F.2d 712, 719 (6th Cir. 1992) (punished inmates' records cleared of any mention of discipline).

**B.    The Proper Defendants In An *Ex Parte Young* Suit Are Individuals In Their Official Capacities Who Can Effectuate A Federal Court Order.**

As stated in the Summary of Argument (p. 2), for prospective injunctive relief per *Ex Parte Young*, the required individual participation of the Defendant officers is in connection with the ongoing constitutional violation or unconstitutional law.  What, then, is required for *Ex Parte Young* suits is that the named Defendant officers in their official capacities be in positions to act with respect to the ongoing constitutional violation or unconstitutional law to end the ongoing violation or law's effectiveness; *Doe v. Univ. of Colorado, Boulder*, 255 F. Supp.3d 1064, 1082 (D. Colo. 2017) ("one requirement for proceeding under *Ex parte Young* is that the defendant be an individual state official (not the state itself) charged with enforcing whatever law is at issue.")  Sometimes university Chancellors and Presidents are the named individual defendant. *Doe v. DiStefano*, 2019 WL 2372685, at *1 (D. Colo. June 5, 2019) ("Philip DiStefano, Chancellor of the University, . . . is the appropriate defendant to name under the doctrine of *Ex parte Young*, 209 U.S. 123 (1908), in light of the relief Plaintiff requests.") [Ex. G].  Defendants misread the cases cited by them to try erroneously to say something different.

Defendants misapprehend the applicable law first by citing four cases that are supposed to concern the "under color of state law" reference in § 1983 but that are way off point.  (Dfs. Mem. 10-11.) Two of the four cases are *Bivens* actions for damages (*Bivens v. Six Unknown Federal Narcotics Agents*, 403 U.S. 388 (1971)), that are not §1983 actions and that do not involve *Ex*

[14]

*Parte Young*. *Ashcroft v. Iqbal*, 556 U.S. 662 (2000), was a *Bivens* damages action in which Muslim detainees sued U.S. government officials for unconstitutional confinement; the action was dismissed on the ground of qualified immunity. *Trulock v. Freeh*, 275 F.3d 391 (4th Cir. 2001), was another *Bivens* damages action, this one brought by a former Department of Education official against a former FBI Director, FBI supervisors and FBI agents for unlawful searches of the plaintiff's townhouse; qualified immunity defeated much of the case. The two § 1983 actions cited by Defendants at this context also do not involve application of *Ex Parte Young*. *Dowe v. Total Action Against Poverty in Roanoke County*, 145 F.3d 653 (4th Cir. 1998), was an employment discrimination suit against a head start center; the Court ruled there was not sufficient state action in what the head start center did in order to invoke § 1983. *Herrera v. Finan*, 176 F.Supp.3d 549 (D.S.C. 2016), *aff'd*, 709 F. App'x 741 (4th Cir 2017) [Ex. H], was a § 1983 action against the commissioners of the South Carolina Commission on Higher Education brought by a plaintiff denied residency status; the Court ruled injunctive relief was not available because the necessary party that could cure the deficiency was not before the Court.

Defendants then misapprehend another series of cases said to require suing state officials to have been involved in the wrongdoing, starting with quoting a line from *Valentine v. Collier*, 993 F.3d 270, 280 (5th Cir. 2021), that "the proper defendant is a state official acting in violation of federal law who has a "sufficient 'connection' to enforcing an allegedly unconstitutional law." (Dfs. Mem. 11.) Defendants spin this sentence to mean something different than what is actually stated, which real meaning is clear from the context of the text in which the sentence appears. What the Fifth Circuit stated in *Valentine v. Collier*, 993 F.3d at 280 (footnotes omitted), was:

> With respect to the Eighth Amendment claim, Collier and Herrera are sued under 42 U.S.C. § 1983 in their official capacity for injunctive relief only. "Under *Ex parte Young*, a case can proceed against individual state officials named in their official capacities when the claim is for an ongoing violation of federal law,

but the relief sought must be prospective." In such a suit, the proper defendant is a state official acting in violation of federal law who has a "sufficient 'connection' to enforcing an allegedly unconstitutional law." Collier is Executive Director of TDCJ and "is responsible for the administration and enforcement of all laws relating to the department including rules implemented by the department but may delegate those responsibilities as permitted by board rule or general law." Herrera is the senior warden of the Pack Unit and generally in charge of operations at this facility. Collier and Herrera, therefore, are the correct officials named in this suit as individuals with authority to act with respect to creation and implementation of COVID-19 policies at the Pack Unit.

Accordingly, the proper *Ex Parte Young* defendants are the individuals charged with enforcing the law, not the individuals who may have engaged in the original complained of acts.

The three other cases cited by Defendants either support the same conclusion or are not *Ex Parte Young* cases. (Dfs. Mem. 11.) In *West Va. Conference of NACCP v. Bonar, No. 2986*, 1978 U.S. Dist. LEXIS 16977 *3 (D. W. Va. June 27, 1978) [Ex. I], the original Superintendent who was sued had been replaced, and while the Court assumed that the Superintendent could be replaced in the lawsuit, the Court mooted that point because the case otherwise called for a summary judgment dismissal. *Foley v. Graham*, 2020 U.S. Dist. LEXIS 23925 *7-8 (D. Nev. Feb. 11, 2020) [Ex. J], ruled that for § 1983 liability under color of state law for damages or injunctive relief, there had to be personal participation of the named defendant; *Ex Parte Young* and prospective injunctive relief were not part of that ruling, nor was *Ex Parte Young* part of the case relied upon by the *Foley v. Graham* Court, *Jones v. Williams*, 297 F.3d 930 (9th Cir. 2002). In *Wiltz v. Shaw*, 2016 U.S. Dist. LEXIS 103420 *9 (S.D. Ill. Aug. 4, 2016) [Ex. K], a prisoner sued for unconstitutional Eighth Amendment violations; for official capacity liability, the Court interposed the Eleventh Amendment to bar money damages and required personal involvement in the violations for injunctive relief; again, *Ex Parte Young* was not part of that ruling.

As a consequence of Defendants' misreading of cases, Defendants err when asserting that Defendants Walters, Mercado and Shealey are not proper defendants for *Ex Parte Young* prospective injunctive relief (Dfs. Mem. 11-12). Defendants Walters, Mercado and Shealey are the proper defendants for *Ex Parte Young* prospective injunctive relief. The Complaint pleads that: (i) Defendant General Glenn M. Walters is the President of The Citadel and is an appropriate person to be subject to injunctive relief for violations of due process; in his official capacity, he is responsibility for The Citadel's and operations as an educational institution of higher learning, which includes compliance with federal and state laws and court decrees specific to The Citadel, including any expungement of a disciplinary record; (ii) Defendant Valerie Mercado is the current Title IX Coordinator at The Citadel and is an appropriate person to be subject to injunctive relief for violations of due process, including any expungement of a disciplinary record; and (iii) Defendant Janet Shealy is the Director of CARE and is an appropriate person to be subject to injunctive relief for violations of due process, including any expungement of a disciplinary record. (Docket Entry 1: Cmplt. ¶¶ 85, 104-105, pp. 33-34.)

### C.    A "Policy or Custom" Is Not A Requirement of *Ex Parte Young* Suits for Prospective Injunctive Relief, But Rather For *Monell v. Dep't of Social Services of N.Y.C.* Suits Against Government Entities For Damages.

As stated in the Summary of Argument (p. 2), for prospective injunctive relief suits brought under *Ex Parte Young* to remedy ongoing injury, a "policy or custom" is not required. That requirement is for damage suits under 42 U.S.C. §1983 against government entities such as municipalities per *Monell v. Dep't of Social Services of N.Y.C.*, 436 U.S. 658 (1978).

Defendants misread two cases to try to reach an erroneous contrary conclusion. (Dfs. Mem. 12.) *Kentucky v. Graham*, 473 U.S. 159, 166 (1985), concerned the liability of Kentucky for the award of fees under 42 U.S.C. § 1983 in a suit for damages for alleged constitutional violations

[17]

for warrantless raids by local and state law enforcement agents; in the course of that opinion, the Court's opinion stated "in an official-capacity suit the entity's 'policy or custom' must have played a part in the violation of federal law," citing *Monell*, but not *Ex Parte Young*, as damage were sought but not prospective injunctive relief, and the "official capacity" was in connection with local and state law enforcement. *Johnson v. Rodriguez*, 110 F.3d 299, 312 (5th Cir. 1997), was a prisoner rights class action in which declarations of violation of constitutional rights and an award of fees were sought; the Fifth Circuit relied upon *Kentucky v. Graham* in stating that the official capacity liability of the prison Board members required a policy or custom; *Ex Parte Young* and prospective injunctive relief were again not involved.

## II.   JOHN DOE HAS PROPERTY AND LIBERTY INTERESTS (DEFENDANTS DO NOT CONTEST); JOHN DOE HAS PLAUSIBLY ALLEGED THAT HE WAS DENIED DUE PROCESS BECAUSE HE WAS NOT AFFORDED "A FAIR OPPORTUNITY TO BE HEARD" BEFORE "AN UNBIASED TRIBUNAL"

As stated in the Summary of Argument (p. 2), because John Doe has property and liberty interests (Defendants do not concede but do not contest the point, Dfs. Mem. 12), John Doe has plausibly alleged that he was denied due process because he was not afforded "a fair opportunity to be heard" before "an unbiased tribunal."  The practical reason why due process matters is so that cases are not decided "on the basis of an erroneous or distorted conception of the law or the facts." *Marshall v. Jerrico, Inc.*, 446 U.S. 238, 242 (1980).  Here, the case was decided upon a clear error distorting the facts regarding the alleged incident at the Law Barracks Sally Port and the allowance to Jane Roe to change the date of the alleged incident in order to avoid the video surveillance footage showing that the accusation was not true.

Defendants' due process argument amounts to: (i) a recitation of the due process requirement of notice and opportunity to be heard; (ii) an off point quotation from *Tigrett v. Rector & Visitors of the Univ. of Va.*, 290 F.3d 620, 629 (4th Cir. 2002), that "*in the absence of a*

*constitutional or statutory deprivation*, courts should be loathe to interfere with the organization and operation of an institution of higher education" (this case involves a constitutional deprivation);  (iii) a quotation from *Vega v. Saleeby*, 2004 WL 3334816 *4-*6 (D.S.C. July 12, 2004)[Ex. L], on due process requirements (which were not satisfied); (iv) an incorrect assertion that Defendants provided the requisite due process; (v) an assertion contrary to the Complaint that John Doe was given the opportunity to cross-examine Jane Roe; and (vi) a totally wrong assertion that the Commandant's decision was based on the "ample evidence" of Jane Roe's testimony. (Dfs. Mem. 12-15.)  The foregoing is not a due process defense on this motion.

Defendants' recitation of due process law in terms of notice and opportunity omits the critical elements of neutrality and impartiality in due process law that a unanimous U.S. Supreme Court discussed in *Marshall v. Jerrico, Inc.*, 446 U.S. at 242:

> The Due Process Clause entitles a person to an impartial and disinterested tribunal in both civil and criminal cases. This requirement of neutrality in adjudicative proceedings safeguards the two central concerns of procedural due process, the prevention of unjustified or mistaken deprivations and the promotion of participation and dialogue by affected individuals in the decision-making process. See *Carey v. Piphus*, 435 U.S. 247, 259–262, 266–267, 98 S.Ct. 1042, 1043, 1050–1052, 1053, 1054, 55 L.Ed.2d 252, (1978). The neutrality requirement helps to guarantee that life, liberty, or property will not be taken on the basis of an erroneous or distorted conception of the facts or the law. See *Mathews v. Eldridge*, 424 U.S. 319, 344, 96 S.Ct. 893, 907, 47 L.Ed.2d 18 (1976). At the same time, it preserves both the appearance and reality of fairness, "generating the feeling, so important to a popular government, that justice has been done," *Joint Anti-Fascist Committee v. McGrath*, 341 U.S. 123, 172, 71 S.Ct. 624, 649, 95 L.Ed. 817 (1951) (Frankfurter, J., concurring), by ensuring that no person will be deprived of his interests in the absence of a proceeding in which he may present his case with assurance that the arbiter is not predisposed to find against him.
>
> The requirement of neutrality has been jealously guarded by this Court. . . .

Notably, Second Circuit Judge Henry Friendly's influential law review article on due process hearings "compile[d] one list enumerating factors that have been considered the elements of a fair hearing, roughly in order of priority," and at the top of Judge Friendly's list was "An Unbiased

Tribunal." H. Friendly, "Some Kind of Hearing," 123 U. Pa. L. Rev. 1267, 1279-1280 (1975). The proper due process focus in this case incorporates consideration of the due process neutrality requirement that Defendants incorrectly ignore and that was not satisfied in this case.

The Complaint gives an account of the hearing to show the factual basis of the lack of due process required impartiality in the hearing and the presumption; yet, those alleged specific facts are largely ignored by Defendants. (Docket Entry 1: Cmplt. ¶¶ 79-82.) The Complaint alleges there was assistance at the hearing that was provided to Jane Roe by Defendant Janet Shealy but was not provided to John Doe. (Docket Entry 1: Cmplt. ¶ 80.) When Cadet "Noa" testified that John Doe was at the Marine lab in the period 16:00-18:00; and that it was a distinct improbability that somehow John Doe was with Jane Roe by 18:00; yet, the Board's questions were aimed at establishing that somehow it was possible that John Doe did go by Jane Roe according to Jane Roe's accusation. (Docket Entry 1: Cmplt. ¶ 81.) The Complaint alleges that John Doe had sought video surveillance for the alleged incident at the Law Barracks Sally Port, but Jane Roe conveniently changed the supposed date of the incident from a date in early October 2019 to on or about September 12, 2019, and video footage of the Law Barracks Sally Port was not available before early October 2019, which was deemed (incredibly) not relevant by the Commandant's Board. (Docket Entry 1: Cmplt. ¶ 82.) Only a biased tribunal would treat the alleged Law Barracks Sally Port incident the way the Board did; only a biased tribunal would allow one-sided assistance; only a biased tribunal would deny cross-examination to protect Jane Roe from impeachment; only a biased tribunal would render the decision it did. (Docket Entry 1: Cmplt. ¶¶ 80-84.)

*Vega v. Saleeby* recognized the due process requirement of cross-examination. While Defendants assert there was an opportunity to cross-examine Jane Roe, there was in fact a non-existent opportunity to cross-examine John Doe's accuser. The Complaint pleads that John Doe's

representative was cut off from the start of questioning about "false memory" despite the he said/she said nature of the case. (Docket Entry 1: Cmplt. ¶¶ 81, 118.) The Complaint most certainly does allege the deprivation of the right of cross-examination, especially given the rules governing motions to dismiss. *Edwards v. City of Goldsboro*, 178 F.3d at 244 ("draw all reasonable inferences from those facts in plaintiff's favor"); *Doe v. Columbia*, 831 F.3d at 48-49 ("construe ambiguities in the light most favorable to upholding the plaintiff's claim"). Defendants drop a long footnote rationalizing the denial of cross-examination, saying without any justification that the allegation was improper under Fed.R.Civ.P. 11. (Dfs. Mem. 14.) What is improper is a spurious drive-by invoking of Rule 11 as a way of avoiding a properly stated allegation of what constituted one reason that due process was denied.

*Vega v. Saleeby* recognized the due process requirement that the decision "be based ample evidence such that the decision is not arbitrary and capricious." While Defendants assert (erroneously) there was ample evidence in Jane Roe's testimony, according to the allegations of the Complaint, Jane Roe certainly did not provide "ample evidence" and the Commandant Board's decision relying upon Jane Roe's testimony was arbitrary and capricious for the female Jane Roe contrary to the overwhelming weight of the evidence. The decision reflected there was no presumption of innocence but rather a presumption that the accusations were true. (Docket Entry 1: Cmplt. ¶ 84.)

Defendants refer only to the testimony of Jane Roe as providing ample evidence because of the testimony of other witnesses, Cadets "Rya," "Noa" and "Sha" contradicted Jane Roe, and even Cadet "Er" mostly did not support Jane Roe. (Docket Entry 1: Cmplt. ¶¶ 80-81.) The testimony of John Doe fully supported his denial of the accusations and his denial of contact with Jane Roe at the Law Barracks Sally Port, that on the day in question, the time he was coming from

a Marine lab and his hands would not have been free to grope Jane Roe as he was carrying his Kevlar and rifle. (Docket Entry 1: Cmplt. ¶ 82.)  John Doe also had character witnesses who said he would not have engaged in the alleged behavior. (Docket Entry 1: Cmplt. ¶ 82.)

The Commandant Board's credibility determination in favor of Jane Roe was made arbitrarily and capriciously, contrary to: (i) the change in Jane Roe's date of the alleged incident at the Law Barracks Sally Port from early October 2019 to September 12, 2019, that conveniently made unavailable video footage of the Law Barracks Sally Port; (ii) the difference between Jane Roe's complaint description of the incident (groping) to what the Commandant's Board supposedly found (rubbing up against); (iii) the non-acceptance of two of the three accusations made by Jane Roe; (iv) John Doe's consistent denial of all the accusations; (v) the witnesses for John Doe who denied that John Doe had engaged in the accused incidents and that they never saw John Doe engage in any sexual harassing or sexually violent behavior toward Jane Roe; and (vi) John Doe's character witnesses.  (Docket Entry 1: Cmplt. ¶ 84.)

## III.    JOHN DOE HAS ALLEGED FACTS THAT MORE THAN RAISE A PLAUSIBLE INFERENCE THAT DEFENDANT THE CITADEL DISCRIMINATED AGAINST JOHN DOE ON THE BASIS OF SEX.

As stated in the Summary of Argument (p. 3), John Doe has alleged facts that more than raise a plausible inference that Defendant The Citadel discriminated against John Doe on the basis of sex.  Defendants helpfully cite the Fourth Circuit decision in *Sheppard v. Visitors of Va. State Univ.*, 993 F.3d 230, 235 (4th Cir. 2021), for the adoption of Judge Barrett's test, now the test in most Circuits, stated in *Doe v. Purdue*, 928 F.3d at 667-668, that a plaintiff must allege facts that, "if true, raise a plausible inference that the university discriminated against John [Doe] on the basis of sex."  Judge Barrett concluded for the Seventh Circuit that on the alleged facts, Purdue had discriminated against John [Doe] on the basis of sex.  928 F.3d at 667-670.

The same conclusion should be reached here. This is a "she said/he said" case over alleged sexual violence (which was brief unwanted sexual contact); two of the three accusations were so unfounded that they had to be rejected; the third accusation that was sustained depended upon Jane Roe being allowed to change the date of the incident to avoid video surveillance tape disproving it. The "believe the woman" and "pro-victim" procedural and adjudicative irregularities and decision-making contrary to the evidence detailed in the Complaint establish the gender bias causing the erroneous discipline. (Docket Entry 1: Cmplt. ¶¶ 1-5, 20, 74-88.) *Menaker v. Hofstra*, 935 F.3d 20, 34 (2d Cir. 2019); *Doe v. Columbia*, 836 F.3d 46, 57 (2d Cir. 2016); *Doe v. Univ. of Arkansas-Fayetteville*, 974 F.3d 858, 864-865 (8th Cir. 2020).

### A.  The Inference of Gender Bias from Clearly Irregular Adjudicative Process.

Defendants cite *Sheppard v. Visitors of Va. State Univ.*, 993 F.3d 230, for the proposition that the plaintiff in that case had failed go allege a causal link between gender and the challenged discipline. (Dfs. Mem. 16-17.) *Sheppard*, however, on its facts was a very different case. There, a male student got into an altercation with an ex-girlfriend and another female and proceeded on a selective enforcement theory that he was treated differently than the two females; he was disciplined for the physical altercation regardless of the fact two females were involved.

Defendants erroneously attack the Complaint as conclusory, citing not the allegations concerning the adjudicative irregularities (Docket Entry 1: Cmplt. ¶¶ 1-5, 20, 74-88), but the secondary allegation that male respondents at The Citadel are found guilty regardless of evidence. (Dfs. Mem. 17.) Consistent with that allegation is what happened in this case, and it is not speculative but rather the subject of proper discovery in the case. This allegation was made also in *Yusuf v. Vassar College*, 35 F.3d 709, 716 (2d Cir. 1994), and upheld by the Second Circuit as sufficient.

[23]

Defendants then characterize John Doe's Title IX case as resting upon the allegation that The Citadel was biased against men.  (Dfs. Mem. 17.)  While part of John Doe's Title IX case is that "believe the woman gender bias" and "pro-victim bias" shown by the alleged facts in this case support an inference that the Citadel discriminated against John Doe on the basis of sex, Defendants skip over the point that adjudicative irregularities discussed in the due process section of this Memorandum of Law (pp. 19-23 above) in themselves establish the gender bias causing the erroneous discipline.  *Menaker v. Hofstra*, *Doe v. Columbia* and *Doe v. Univ. of Arkansas-Fayetteville* rule that the circumstances of adjudicative irregularities, which include decision-making contrary to the substantial weight of the evidence, support an inference of gender bias. *Menaker v. Hofstra* explained (935 F.3d at 34, footnotes omitted):

> [W]e need not define precisely what sort of irregularities meet the standard of "clearly irregular investigative or adjudicative process."  But we note that *Doe v. Columbia* offers some guidance on this issue. For instance, "[w]hen the evidence substantially favors one party's version of a disputed matter, but an evaluator forms a conclusion in favor of the other side (without an apparent reason based in the evidence), it is plausible to infer (although by no means necessarily correct) that the evaluator has been influenced by bias." Similarly, where decision-makers choose "to accept an unsupported accusatory version over [that of the accused], and declined even to explore the testimony of [the accused's] witnesses," this too "gives plausible support to the proposition that they were motivated by bias."

*See Feibelman v. Trustees of Columbia*, 2020 WL 882429 *9 (S.D.N.Y. Feb. 24, 2020) [Ex. Q] (Title IX erroneous outcome case sufficiently stated because of "plead[ing] the existence of gender bias, an incorrect outcome, and a "causal connection" between the bias and the error," citing *Yusuf*, 35 F.3d at 715); *Doe v. Purdue*, 928 F.3d at 669 (female accuser credited by Dean even though female accuser never appeared before the decision-maker Dean and never even talked with Dean).

**B.  Sex Discrimination Is Shown By "Believe The Woman" Gender Bias.**

The Complaint pleads that "believe the woman gender bias" and "pro-victim bias" explain the procedural and adjudicative irregularities and the decision-making contrary to the evidence.

(Docket Entry 1: Cmplt. ¶¶ 4, 5, 84, 116, 119.)  Defendants' assertion that allegations of "believe the woman gender bias" and "pro-victim bias" are insufficient to support a case of sex discrimination, even against a motion to dismiss, is an illogical denial of the well pleaded gender bias here and cannot be rationalized away given the rules governing motions to dismiss and a careful reading of the cases.

Defendants wrongly attack as conclusory the Complaint's allegations, at paragraphs 119 and 121, of a victim-centered process in which the male student is prosecuted under a presumption of guilt and allegation of The Citadel's crediting of a false accusation of sexual violence and presuming the accusations to be true instead of applying a preponderance of the evidence in a reasoned consideration.  (Dfs. Mem. 17.)  Those two allegations are included in the statement of the Title IX cause of action and are not conclusory as they rest upon the facts alleged in the case that reflect those very problems.  (Docket Entry 1: Cmplt. ¶¶ 1-5, 20, 74-87).

Defendants cite *Doe v. Coastal Carolina*, 522 F.Supp.3d 173, 181 (D.S.C. 2021), for the proposition that more favorable treatment of "victims" is not evidence of gender bias (Dfs. Mem. 17-18), but Defendants unjustifiably generalize the case way too far with that argument, quoting a passage divorced from the specific facts and actual rulings of the case. *Doe v. Coastal Carolina* was not on a motion to dismiss but on summary judgment, and there was a factual record in which the respondent was the assailant, the complainant was the "victim" and the complainant was treated more favorably.  That relatively limited point from a factual record in *Doe v. Coastal Carolina* does not contradict at all the separate point in the Complaint here that a "pro-victim bias" (Docket Entry 1: Cmplt. ¶ 119) combined with "believe the woman gender bias" (Docket Entry 1: Cmplt. ¶¶ 84, 116) and with the fact most all university complainants are female and most all respondents are male (Docket Entry 1: Cmplt. ¶ 37) produces an otherwise unjustified systematic presumption

of male guilt that more than sufficiently pleads gender bias. If the system is victim-centered, it is not neutral and impartial; with females as the "victim" complainants and males the "accused" respondents, a victim-centered process thus in reality advantages females contrary to Title IX; universities are responsible under Title IX for the fairness of their procedures.

Defendants attack the pleading of the "believe the woman gender bias" on the ground that "this may be more accurately characterized as a 'believe the victim' bias" and "is not directly related in any way to gender." (Dfs. Mem. 18.) No, it can't be so characterized, particularly on a motion to dismiss; the basic law governing motions to dismiss (p. 10) precludes such playing with words; and there are no proper grounds here for such reformulation. Defendants are simply trying to avoid the point that sex discrimination is shown by the "believe the woman" gender bias -- that the reality in the context of campus sexual misconduct proceedings is that the "victim" is the "woman" who is to be "believe[d]"; the Complaint pleads, citing a United Educators study, that in these campus sexual proceedings, 99% of university complainants are female and 99% of respondents are male (Docket Entry 1: Cmplt. ¶ 37); "[t]he 'believe the woman' bias evidenced in the Commandant's Board proceeding and the disposition of John Doe's appeal demonstrated that John Doe was discriminated against on the basis of sex." (Docket Entry 1: Cmplt. ¶ 116.)

Again, Defendants unjustifiably generalize way too far the cases it cites, quoting snippets divorced from the specific facts and actual rulings of the cases. (Dfs. Mem. 18-20.)

In *Haley v. Virginia Commonwealth Univ.*, 948 F. Supp. 573 (E.D. Va. 1996), the Court on summary judgment dismissed the Title IX claim. The claims of favoritism of the complainant's attorney over the respondent's attorney and the Dean's role as prosecutor before the Hearing Board were rejected as insufficient evidence of gender bias.

In *Mulla v. Univ of Minnesota*, 2021 U.S. Dist. LEXIS 28469 (D. Minn. Feb. 16, 2021)[Ex. M], the Court found insufficient that the plaintiff did not allege that the April 2011 Dear Colleague Letter required the disciplining of men.  But that limited point is not contradicted at all by what the Complaint alleges in a lengthy analysis of what the April 2011 Dear Colleague Letter actually said and functioned (Docket Entry 1: Cmplt. ¶¶ 25-44): the April 2011 Dear Colleague Letter "explicitly focused on protection of women and effectively equated 'victims and 'complainants' in sexual misconduct proceedings as women who must receive preferential treatment," "imposed numerous mandates that inherently made it more difficult for males accused of sexual misconduct to defend themselves," and that it caused "universities to devise victim centered procedures for adjudicating sexual assault that are not neutral and impartial" with "the reality is that males are almost always the accused respondents and females are almost always the 'victim' complainants" (Docket Entry 1: Cmplt. ¶¶ 29, 32, 37).

The Court in *Doe v. University of Colo.*, 255 F. Supp.3d 1064, 1075-1076, 1077-1079 (D. Colo. 2017), actually made a more nuanced analysis, recognizing the plausibility of sex discrimination when two classifications (*e.g.*, sex assault suspect and male) are routinely presented, and then ruled that an all-female Title IX team and the Women's Studies background of the investigator did not provide the basis for an inference of gender bias.

The Court in *Doe v. Marian Univ.*, 2019 U.S. Dist. LEXIS 222842 *34 (E.D. Wis. Dec. 31, 2019) [Ex. N], repeated the assertion that bias in favor of alleged victims and "believe the victim" did not equate to gender bias, but there the plaintiff failed to connect the "victim" to gender or otherwise identify anti-male conduct or statements.

The Court in *Doe v. Rider Univ.*, 2018 U.S. Dist. LEXIS 7592 *26-27 (D.N.J. Jan. 17, 2018) [Ex. O], repeated the point that bias against the alleged perpetrator is insufficient to show

[27]

an inference of gender bias, noting that sexual assault victims may be male or female.  At the same time, the Court recognized that the Second Circuit upheld the Title IX Complaint in *Doe v. Columbia*, 831 F.3d 46, that included the allegations that the investigator and hearing panel had failed to act as sources favorable to the plaintiff and that the disciplinary decision was contrary to the weight of the evidence.  The hypothetical point that sexual assault victims may be male or female is precluded by the Complaint's pleading here.

*Doe v. University of Dayton*, 766 F. App'x 275 (6th Cir. 2019) [Ex. X], ruled that the plaintiff had failed to demonstrate the requisite gender bias by a Resolution Agreement with the DOE's Office for Civil Rights, a Hearing Board member supporting a film on campus sexual assault and the bringing of sexual assault proceedings against only males.

*Doe v. Coastal Carolina*, 522 F.Supp.3d at 180, did state that statistical evidence alone does not establish gender bias; "[h]owever," the Court went on to state that "they [the statistics] may provide context when combined with circumstantial evidence of bias in a particular case."

*Brown v. Porter*, 2019 U.S. Dist. LEXIS 230426 *64 (E.D. Va. Nov. 26, 2019) [Ex. P], is cited by Defendants because Defendant complain about a follow up sentence in the Complaint's pleading of "believe the woman" bias, which was that "[t]he 'believe the woman' bias was reinforced by the fact that John Doe is of African-American and Italian ancestry and Jane Roe is white."  (Docket Entry 1: Cmplt. ¶ 116).  The point made in the Complaint is clear and is not undercut by *Brown v. Porter*'s ruling that Title VI racial discrimination that in that case was not supported by national origin and religious affiliation issues.

In short, Defendants' cited cases do not undercut the "believe the woman" as sufficient pleading of gender bias.

## C.  **The Relevance of the 2011 Dear Colleague Letter.**

The relevance of the 2011 Dear Colleague Letter is the "backdrop" to a plausible Title IX case that alleges other facts showing discrimination.  *Doe v. Purdue*, 928 F.3d at 668-669, citing *Doe v. Baum*, 903 F.3d 575, 586 (6th Cir. 2018).  Defendants themselves cite a series of cases ruling what can be called the Judge Barrett *Doe v. Purdue* view that the 2011 Dear Colleague Letter provides a backdrop story why a school may be motivated to discriminate against males but does not by itself plead gender bias: *Doe v. Coastal Carolina*, 522 F.Supp.3d at 179; *Doe v. University of Denver*, 952 F.3d 1182, 1192 (10th Cir. 2020); *Doe v. Regents of the Univ. of Minnesota*, 999 F.3d 571, 578 (8th Cir. 2021).  (Dfs. Mem. 21-22.)  As pointed out by the Eighth Circuit in *Doe v. Regents of the Univ. of Minnesota*, 999 F.3d at 578 "external pressure from public attention and the threatened loss of federal funding 'provides a backdrop that, when combined with other circumstantial evidence of bias in [the Does'] specific proceeding, gives rise to a plausible claim' of intentional bias."  *See Doe v. University of Denver*, 1 F.4[th] 822 (10th Cir. 2021) ("*Denver II*") (the difference in treatment of complaints -- complaints by males not investigated and rejected versus complaints by females investigated and sustained -- supports inference of gender bias).

Defendants skip over paragraphs 25-44 of the Complaint (Dfs. Mem. 20) concerning what the April 2011 Dear Colleague Letter actually said and how it functioned, as described above (p. 27).  As a result, Defendants miss the point when calling the pleading of the April 2011 Dear Colleague Letter conclusory as to the specific effect of the 2011 Dear Colleague Letter on The Citadel. (Dfs. Mem. 22-23.)  The pleading as to the 2011 Dear Colleague Letter is anything but conclusory (Docket Entry 1: Cmplt. ¶¶ 25-44), and its contents and its effect included schools such as The Citadel devising "victim centered procedures for adjudicating sexual assault that are not neutral and impartial" with "the reality is that males are almost always the accused respondents

and females are almost always the 'victim' complainants" (Docket Entry 1: Cmplt. ¶ 37). The "more" that the Complaint in this case pleads for gender bias, however, is not specific pressure from the Department of Education, as in *Doe v. Miami*, 882 F.3d 579 (6ᵗʰ Cir. 2018), *Doe v. Univ. of Arkansas - Fayetteville*, 974 F.3d 858, and *Gischel v. Univ. of Cincinnati*, 2018 U.S. Dist. LEXIS 230848 (S.D. Ohio Jan. 23, 2018) [Ex. Y]. The "more" for gender bias in this case are the "believe the woman" and "pro-victim" procedural and adjudicative irregularities and decision-making contrary to the evidence detailed in the Complaint causing the erroneous discipline. (Docket Entry 1: Cmplt. ¶¶ 1-5, 20, 74-88.)

Defendants note that the 2011 Dear Colleague Letter has been rescinded (Dfs. Mem. 24), but do not review the Complaint's allegations at paragraphs 65-71 concerning that revocation, which was based on the need for due process that was lacking and based on a recognition that the 2011 Dear Colleague Letter placed "improper pressure upon universities to adopt procedures that do not afford fundamental fairness" and are "overwhelmingly stacked against the accused." (Docket Entry 1: Cmplt. ¶¶ 66, 68.) Defendants' continued adherence to victim centered procedures are not in accord with the revised procedures. The failure to follow the current guidance has been ruled to be a contributing fact to a finding of Title IX discrimination. *Doe v. American University*, 2020 WL 5593909 at *9 (D.D.C. Sept. 18, 2020) [Ex. Z].

## IV. PSEUDONYM TREATMENT OF "JOHN DOE" AND "JANE ROE" IS PROPER PER *JAMES V. JACOBSON*, 6 F.3d 233, 238 (4ᵀᴴ Cir. 1993), AND PER THE CURRENT CASE LAW AROUND THE COUNTRY FINDING THAT IN THE CIRCUMSTANCES OF CHALLENGING COLLEGE SEXUAL MISCONDUCT PROCEEDINGS, SO AS TO MAINTAIN THE LITIGATION STAUS QUO OF ANONYMITY IN CASES ARISING OUT OF A CONFIDENTIAL UNIVERSITY DISCIPLINARY PROCESS, THE REQUISITE FACTORS FOR PSEUDONYM TREATMENT EXIST.

As stated in the Summary of Argument (p. 4), pseudonym treatment of "John Doe" and "Jane Roe" is justified per *James v. Jacobson*, 6 F.3d 233, 238 (4ᵗʰ Cir. 1993), and per the current

case law around the country finding that in the circumstances of challenging a college sexual misconduct proceeding, so as to maintain the litigation status quo of anonymity in cases arising out of a confidential university disciplinary process, the factors for pseudonym treatment exist.

Defendants begin by asserting it was "inappropriate" to commence an action with a pseudonym. (Dfs. Mem. 25.) As Defendants know well but wrongly do not acknowledge is that John Doe, when filing his Complaint, also made an *ex parte* motion for pseudonym status for himself and his accuser, and that application was granted on an interim basis. (Docket Entry 9: Ex Parte Order.) And further, seeking use of pseudonyms in this kind of case should be expected because in the case law in the last ten years, in cases involving alleged sexual misconduct of college-age students, application of the legal factors granting pseudonym treatment have almost uniformly resulted in the courts' granting pseudonym treatment.[1]

While Fed.R.Civ.P. 10(a) provides that the complaint must name the parties and the party seeking pseudonym treatment has the burden of demonstrating a legitimate basis, the proper use

---

[1] The U.S. Courts of Appeal have issued decisions in numerous Title IX cases involving plaintiffs that were permitted to use pseudonyms. *See*, *e.g.*, *Doe v. Columbia*, 831 F.3d 46 (2d Cir. 2016); *Doe v. Miami*, 882 F.3d 579 (6th Cir. 2018); *Doe v. Oberlin*, 963 F.3d 580 (6th Cir. 2020); *Doe v. University of Sciences*, 961 F.3d 203 (3d Cir. 2020); *Doe v. Purdue*, 928 F.3d 652 (7th Cir. 2019); *Doe v. University of Denver*, 1 F.4th 822 (10th Cir. 2021); *Doe v. Univ. of Arkansas-Fayetteville*, 974 F.3d 858 (8th Cir. 2020). So have U.S. District Courts in numerous Title IX and/or breach of contract cases permitted the use of pseudonyms for plaintiffs who were accused of sexual misconduct. *See, e.g., Doe v. Colgate,* 2016 WL 1448829 (N.D.N.Y. Apr. 12, 2016) [Ex. B]; *Doe v. Purdue*, 321 F.R.D. 339 (N.D. Ind. 2017); *Doe v. Trustees of Dartmouth College*, 2018 WL 2048385 (D.N.H. May 2, 2018) [Ex. C]; *Doe v. Harvard Univ.*, 462 F.Supp.3d 51 (D.Mass.2020); *Doe v. Brown Univ.*, 166 F.Supp.3d 177 (D.R.I. 2016); *Doe v. Syracuse Univ.*, 457 F.Supp.3d 178 (N.D.N.Y. 2020); *Doe v. Vassar College,* 2019 WL 6222918 (S.D.N.Y. Dec. 21, 2019) [Ex. R]; *Doe v. Brandeis Univ.*, 177 F.Supp.3d 561 (D. Mass. 2016); *Doe v. Stonehill College Inc.*, 2021 WL 706228 (D. Mass. Feb. 23, 2021) [Ex. S]; *Doe v. Amherst College*, 238 F.Supp.3d 195 (D. Mass. 2017); *Doe v. Washington and Lee Univ.*, 473 F.Supp.3d 909 (W.D. Va. 2015); *Doe v Rollins College*, 2020 WL 8409325 (M.D. Fla. July 13, 2020) [Ex. T]; *Doe v. Lynn Univ., Inc.*, 224 F.Supp.3d 1288 (S.D. Fla. 2016); *Doe v. Trustees Univ. Pennsylvania*, 270 F. Supp.3d 799 (E.D. Pa. 2017); *Doe v. Univ. of Cincinnati*, 2018 WL 1521631 (S.D. Ohio Mar. 28, 2018)[Ex. U].

of pseudonym treatment has been recognized in cases involving abortion (*e.g.*, *Roe v. Wade*, 410

U.S. 413 (1973)), birth control, mental illness, and welfare rights of illegitimate children, *Doe v.*

*Megless,* 654 F.3d 404 (3d Cir. 2011), and now college sexual misconduct disciplinary cases.

Defendants' discussion of the pseudonym issue here suffers from not addressing the use of

pseudonyms in cases arising out of college and university disciplinary sexual misconduct

proceedings in more recent years.  None of the cases cited by Defendants for the law on pseudonym

treatment involve such cases, but rather older cases in different contexts. (Dfs. Mem. 25-26.)  In

*CTH I Caregiver v. Owens*, 2012 U.S. Dist. LEXIS 90998 (D.S.C. July 2, 2012) [Ex. V], the

plaintiff was a health care worker who attended to two pseudonym named patients, who got into

an employment dispute with her health care employer and who did not seek permission for

pseudonym status for herself.  *Qualls v. Rumsfeld*, 228 F.R.D. 8 (D.D.C. 2005), was a suit by

soldiers serving in Iraq who challenged the extensions of duty.  *Roe v. CVS Caremark Corp.*, 2014

U.S. Dist. LEXIS 193843 (D.S.C. Sept. 11, 2014) [Ex. W], involved a mental health plaintiff and

an application to his case of the factors for determining whether to grant pseudonym treatment

recognized in *James v. Jacobson*, 6 F.3d 233 (4th Cir. 1993).  In *James*, the issue was a wife and

husband suing a physician over the artificial insemination of the wife.

Defendants, citing *James*, deny that this case involves highly sensitive issues and any risk

of retaliatory harm.  (Dfs. Mem. 26-27.)  Those denials have been flatly rejected in the college-

age sexual misconduct cases.  *Doe v. Colgate*, 2016 WL 1448829, *Doe v. Purdue,* 321 F.R.D. 339,

and *Doe v. Trustees of Dartmouth College*, 2018 WL 2048385, granted pseudonym treatment,

citing such factors as information of the utmost intimacy, injury to the plaintiff from revealing his

identity while seeking vindication, lack of prejudice to the university defendants, the plaintiff's

identity having been kept confidential, the maintenance of open proceedings and the actual

identities of the plaintiff and his accuser were of minimal value to the public. Pseudonym treatment for the male plaintiff and female accuser has protected their due process rights. *James*, to the extent still applicable, is satisfied in this case.

*Doe v. Colgate*, 2016 WL 1448829, applied what are the first two factors recognized by the Second Circuit Court of Appeals in *Sealed Plaintiff v. Sealed Defendant # 1*, 537 F.3d 185, 190 (2d Cir. 2008) -- (1) whether the litigation involves matters that are highly sensitive and of a personal nature and (2) whether identification poses a risk of retaliatory physical or mental harm to the party seeking to proceed anonymously or to other innocent non-parties -- as follows:

> While the Court is mindful of the high burden a plaintiff must meet to show that anonymity is warranted, the Court takes note that courts across the country have allowed plaintiffs alleging similar claims against colleges and universities stemming from investigations of sexual assault to proceed anonymously (citations omitted). Defendants argue that cases where the parties consented to allow a plaintiff to proceed under pseudonym are somehow unpersuasive. Resp. at 6. However, the Court finds that these cases indicate that the accused colleges and universities recognize the highly personal and sensitive nature of these cases as well as the limited value of forcing plaintiffs to reveal their identities when seeking to vindicate their federal rights. *See, e.g., Doe v. Columbia*, 101 F. Supp. 3d at 360 n.1 ("Columbia consented to Plaintiff's request to proceed pseudonymously in light of the 'sensitive subject matter and the age of the students involved.'").
>
> Plaintiff further argues that disclosure of his identity would result in significant harm to him and would undermine his purpose in bringing this action, which is to seek redress for reputational harm he alleges he incurred as a result of Defendants' actions. Mem. at 10. The Court finds this argument persuasive. Should Plaintiff prevail in proving that the charges against him were unfounded and the procedures Defendants followed in their investigation were unfair, forcing Plaintiff to reveal his identity would further exacerbate the emotional and reputational injuries he alleges. . . .

2016 WL 1448829, at *3.

The District Court in *Doe v. Purdue,* 321 F.R.D. 339, also applied the multi-factor test of the Second Circuit Court of Appeals in *Sealed Plaintiff v. Sealed Defendant # 1*, which had been cited with approval by the Seventh Circuit Court of Appeals in *Elmbrook Sch. Dist.*, 658 F.3d 710,

724 (7th Cir. 2011), *aff'd en banc in relevant part*, 687 F.3d 840, 842–43 (7th Cir. 2012). One

factor calling for pseudonym treatment recognized in *Doe v. Purdue,* 321 F.R.D. at 342, was:

> [T]his litigation requires the disclosure of "information of the utmost intimacy," as
> demonstrated by the details set out in the Complaint, including information
> regarding Plaintiff's and Jane Doe's sexual relationship, Jane Doe's allegations of
> sexual misconduct, and the details of the University's findings. Other courts have
> permitted plaintiffs alleging similar claims against colleges and universities to
> proceed anonymously.

Another factor cited in *Doe v. Purdue,* 321 F.R.D. at 343, a factor also very present in this case,

was the injury from identification when seeking vindication:

> [T]he Court considers whether Plaintiff would risk suffering injury if identified,
> which is related to the factor considered by the Second Circuit Court of Appeals of
> whether the injury litigated against would be incurred as a result of the disclosure
> of the plaintiff's identity. This factor also weighs in Plaintiff's favor. If Plaintiff's
> identity is revealed, Plaintiff would suffer the very harm to his reputation that he
> seeks to remedy by bringing this lawsuit; in other words, if Plaintiff is successful
> in proving that the charges of sexual misconduct against him were unfounded and
> that Defendants' procedures violated his due process rights, the revelation of
> Plaintiff's identity "would further exacerbate the emotional and reputational injuries
> he alleges." *Colgate Univ.*, 2016 WL 1448829, at *3.

> *Doe v. Trustees of Dartmouth College* stated:

> [P]laintiff contends that public identification will significantly harm his reputation,
> as well as future educational and career prospects. He also states that he may be
> subjected to harassment if he is publicly identified.  Based on the evidence
> presented by plaintiff, the court is persuaded that these potential harms are severe
> and reasonable. Undoubtedly, "one's sexual practices are among the most intimate
> parts of one's life," and the public disclosure of such information may subject one
> to embarrassment or ridicule. *Doe v. Blue Cross & Blue Shield of R.I.*, 794 F. Supp.
> 72, 74 (D.R.I. 1992) (discussing in context of transgender plaintiff). . . .

> More significant in this case is plaintiff's argument that public disclosure will
> subject him to reputational damage and will impair his future educational and career
> prospects, regardless of the actual outcome of this action. Plaintiff cites other
> campus sexual-assault cases to show that the mere accusation that one has
> committed a sexual assault can subject the accused to lasting reputational damage
> and harassment, even where, as here, the accused is ultimately found not culpable
> of sexual assault. *See* doc. no. 21 at 6–7 (discussing other cases). Such a concern is
> only exacerbated in the Internet age, which can provide additional channels for

harassment and will connect plaintiff's name to Dartmouth's findings and sanction forever, whether or not he is successful in this litigation. . . .

Thus, this is not a case where, far from damaging plaintiff's reputation, the litigation will afford plaintiff an opportunity to "clear his name in the community." _Megless_, 654 F.3d at 410. Plaintiff has a reasonable fear that, whatever the outcome of the action, public identification will subject him to severe reputational harm and harassment, and will defeat the very purpose of this litigation.

Even more salient to the court is [female accuser] Sally Smith's interest in anonymity. Should plaintiff be publicly identified, Sally would likely be identified as well, and Sally has a stronger case for anonymity. . . .

2018 WL 2048385, at *5-6.

## **CONCLUSION**

For the reasons stated above, Defendants' Rule 12(b)(6) motion to dismiss John Doe's Complaint should be denied, including as to objecting to pseudonym treatment, and the Court should grant such other and further relief as the Court deems just and proper.

**Dated: May 9, 2022**

**Respectfully submitted,**
**LAW OFFICES OF DAVID AYLOR**          **NESENOFF & MILTENBERG, LLP**

**24 Broad St.**                        _/s/ Philip A. Byler_

**Charleston, South Carolina 29401**    **Philip A. Byler, Esq. (_pro hac vice_ admission)**
**(843) 577-5530**                      **Andrew T. Miltenberg, Esq.**
**david@davidaylor.com**                **363 Seventh Avenue, Fifth Floor**
                                        **New York, New York 10001**
                                        **(212) 736-4500**
                                        **pbyler@nmllplaw.com**

_/s/ Stephen Schmutz_
**LAW OFFICES OF STEPHEN SCHMUTZ**
**24 Broad St.**
**Charleston, South Carolina 29401**
**(843) 577-5530**
**steve@schmutzlaw.com**
                  **Attorneys for Plaintiff John Doe**